In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK, by JESSE S. PHILLIPS, as Superintendent of Insurance, for an Order to Take.Possession of the Property of the CASUALTY COMPANY OF AMERICA.

In the Matter of the Claim of E. W. BLISS COMPANY, Respondent.

THE SUPERINTENDENT OF INSURANCE OF THE STATE OF NEW YORK, Appellant.

(Argued January 14, 1929; decided March 19, 1929.)

*Charles B. McLaughlin* and *Clarence C. Fowler* for appellant. The referee erred in rejecting testimony showing that the forgings delivered by the claimant were not that well-known article of trade required by the contract, namely the three-inch Russian shrapnel shells, and showing that the steel furnished was not machineable by ordinary commercial methods. (*Sanford* v. *Brown*, 203 N. Y. 90; *Industrial & General Trust, Ltd.*, v. *Tod*, 180 N. Y. 215; *Simon* v. *Etgen*, 152 App. Div. 399; *Claflin's, Inc.*, v. *Gerber*, 214 App. Div. 242; *Columbus Spa, Inc.*, v. *Star Co.*, 216 App. Div. 218; *Fleischman* v. *Furgueson*, 223 N. Y. 235; *Schoellkopf* v. *Coatsworth*, 166 N. Y. 77; *Moran* v. *Standard Oil Co., Inc.*, 211 N. Y. 187; Horton on Ev. 962; *Gravenhorst* v. *Zimmerman*, 236 N. Y. 22; *Fuller* v. *Robinson*, 86 N. Y. 306; *Com. Exch. Bank* v. *Nassau Bank*, 91 N. Y. 74; *Dana* v. *Fiedler*, 12 N. Y. 40; *Hoe* v. *Sanborn*, 21 N. Y. 552; *Gaylord Mfg. Co.* v. *Allen*, 53 N. Y. 515; *Carleton* v. *Lombard, Ayres & Co.*, 149 N. Y. 137.)

*Eli J. Blair* and *George W. Field* for respondent. The forgings did not make performance impossible. (*Traylor* v. *Crucible Steel*, 192 App. Div. 445; *Downey* v. *Shipston*, 206 App. Div. 55; *Boret* v. *Vogelstein & Co., Inc.*, 188 App. Div. 605; 230 N. Y. 573; *Town of North Hempstead* v. *Public Service Corp.*, 107 Misc. Rep. 19; 192 App. Div. 924; *Crown Embroidery Works* v. *Gordon*, 190 App. Div. 472; *Richards & Co., Inc.*, v. *Wreschner*, 174 App. Div. 484; *Krulewitch* v. *Nat. Importing & Trading Co.*, 195 App. Div. 544; *Froehlich* v. *K. W. W. Holding Co., Inc.*, 116 Misc. Rep. 275; 201 App. Div. 855; *Standard*

*Silk D. Co. v. Roessler & Hasslacher Chemical Co.*, 244 Fed. Rep. 250; *Pierson & Co. v. Mitsui & Co., Ltd.*, 111 Misc. Rep. 388.)

KELLOGG, J.   The claim sets up a contract between the E. W. Bliss Company and the Santo Manufacturing Company; the execution, by the Casualty Company of America, of a bond in the penal sum of $50,000 for the faithful performance of the contract by Santo Company; the non-performance by Santo Company of its contract undertaking to machine finish a stipulated quantity of forgings for Russian shrapnel shells; the performance by Bliss Company of all obligations imposed upon it by the contract; the incurrence of damages by Bliss Company in excess of $150,000; the institution of liquidation proceedings by the State Superintendent of Insurance against the Casualty Company; the entry into possession of all its assets and affairs by such Superintendent; a demand for an allowance of the claim against the Casualty Company in the sum of $50,000.   The claim was filed with the State Superintendent of Insurance, who made answer denying its allegations and setting up certain affirmative defenses.   The issues were sent to a referee to take proof and report.   All the allegations of the claim were established without dispute, with one exception. That Bliss Company, on its part, had  fully performed all the conditions and obligations imposed upon it by the contract, expressly or by implication, was vigorously controverted.   After various hearings, the referee reported that while Bliss Company had performed on its part, Santo Company had breached the contract to the damage of Bliss Company in a sum exceeding $135,000.   He recommended that the claim be allowed against the Casualty Company in the sum of $50,000.   The report was confirmed at Special Term.   The order of the Special Term, confirming the report, was affirmed at the Appellate Division.

The contract between Bliss Company and Santo Com-

pany was expressed in writings. These consisted of a letter written by Santo Company to Bliss Company, containing offers, and a letter accepting the offers, written on August 4, 1915, by the latter to the former. The letter by Santo Company read, in part, as follows: "We agree to machine finish one hundred and twenty-five thousand (125,000) three-inch (3″) Russian shrapnel bodies, using forgings furnished by you, in accordance with your drawings and specifications. We will grease and pack the finished cases in ordinary shipping boxes of your design and specifications, and will deliver them f. o. b. New York or Brooklyn, at the price of one dollar and eighty cents ($1.80) each, or if delivery is called for by you to some other point we will allow freight to Brooklyn, N. Y. * * * It is understood that the forgings furnished by you will be of steel that will readily yield the following physical properties: tensile strength not less than 125,000 lbs. per sq. in. Elastic limit not less than 82,000 lbs. per sq. in. Elongation 2″ not less than 10%. * * * Deliveries to be as follows: September 20,000; October 30,000; November 35,000; December 40,000." The contract, shortly after its making, was altered to increase the number of forgings to be machined from 125,000 to 150,000 and slightly to vary the specifications as to monthly deliveries. The contract stipulation that deliveries of all machine finished forgings would be completed before December 31, 1915, remained unchanged.

On August 20, 1915, Bliss Company and the Vickers Company, Ltd., of England, entered into a formal contract, whereby the former agreed to supply the latter, for a stipulated price, with 925,000 three-inch Russian shrapnel bodies, according to specifications agreed upon. These specifications were identical with those governing the contract between Bliss Company and Santo Company, with the one exception that the tensile strength, elastic limit and elongation provided for by the Vickers contract was slightly less than the similar physical

properties provided for by the contract with Santo Company. While the formal Bliss-Vickers contract was not executed until after the making of the Bliss-Santo contract, negotiations therefor had been in progress long previously thereto, and the latter contract was clearly made in view of the former and to further its performance.

Prior to December 31, 1915, Santo Manufacturing Company had failed to make substantial performance of its contract obligations. In February, 1916, Bliss Company, with the consent of the Casualty Company, extended the time for performance to April 30, 1916. On or about May 1st it notified Santo Company that it would receive from it no forgings, which had been machine finished by it after May 13th. On that date all shipments ceased. The number of forgings which had been machine finished and shipped was 46,876. It thus appears that Santo Company had then finished and delivered less than one-third of the number of forgings which it had undertaken to machine.

On the hearing before the referee abundant testimony was given by the appellant to establish the following facts: The forgings, furnished by Bliss Company to Santo Company, with respect to tensile strength, elastic limit and elongation, in general largely exceeded, in some instances by over one hundred per cent, the contract terms specifying the required minimum of such physical properties. The forgings were of chrome alloy rather than carbon steel. From these circumstances, there resulted an extraordinary hardness of the constituent metal, making it difficult, if not impossible, for Santo Company to machine finish the forgings. Tools employed by Santo Company to do the machine finishing broke under the strain of cutting. Not only did the tools consistently break, but the lathes themselves were destroyed. Other difficulties attended the work. The forgings had been unequally tempered by Bliss Company; they were alternately hard and soft. When a cutting

tool struck a hard spot the forging would jump back, with the result that the tool barely scratched the surface. On the rebound the tool would strike deeply into a succeeding soft spot and tear up the forging. Such were the difficulties in the way of correct machine finishing that prior to February, 1916, Santo Company had finished only a small quantity of the forgings. In that month it secured permission from Bliss Company to submerge the forgings in baths of lead heated to 1,200 degrees Fahrenheit. This method of heat treatment resulted in greatly softening the metal, so that it became more readily machineable. In consequence, Santo Company was enabled greatly to accelerate and increase its deliveries to Bliss Company. However, difficulties still attended the machine finishing. These facts were established without dispute. Upon the subject of machineability the only evidence offered by Bliss Company was to the effect that a large quantity of forgings taken from the same lot as were those supplied to Santo Company had been successfully machine finished by Bliss Company.

It is the settled rule of the common law that where a manufacturer contracts to supply an article manufactured or produced by him, to be applied to a particular purpose, an implied term or warranty on his part, that the article shall be reasonably fit for the purpose, enters into or attends the contract. (*Jones* v. *Just*, 3 Q. B. 197; *Hoe* v. *Sanborn*, 21 N. Y. 552; *Gaylord Mfg. Co.* v. *Allen*, 53 N. Y. 515; *Carleton* v. *Lombard, Ayres & Co.*, 149 N. Y. 137; *Bierman* v. *City Mills Co.*, 151 N. Y. 482; *Heath Dry Gas Co.* v. *Hurd*, 193 N. Y. 255; *Kellogg Bridge Co.* v. *Hamilton*, 110 U. S. 108.)

In *Hoe* v. *Sanborn* (*supra*) it was held that a manufacturer who undertook to supply saws to be incorporated in circular saw mills manufactured by another impliedly warranted that the metal of the saws would be *sufficiently hard* to perform the work designed to be accomplished by the mills.

The implication of a warranty of fitness is not peculiar to the law of sales; it arises in cases of bailment. Thus, one who lets property for hire impliedly warrants that it is suitable for the purpose for which it is hired and is liable for the damages which may result from its unsuitability. (Williston on Contracts, § 1041; *Vogan & Co.* v. *Oulton*, 81 L. T. Rep. 435; *Hyman* v. *Nye & Sons*, L. R. 6 Q. B. D. 685; *Fowler* v. *Lock*, L. R. 7 C. P. 272; *Hoisting Engine Sales Co.* v. *Hart*, 237 N. Y. 30.) One who lets a horse and carriage to another, that he may take a particular journey, impliedly warrants that they are suitable for the purposes of the trip and is liable if, through the restiveness of the horse or the breaking of the carriage, the person hiring them is injured. (*Hyman* v. *Nye & Sons, supra; Fowler* v. *Lock, supra.*) A dealer who supplies sacks for bagging peas, in order that they may be unloaded from a ship, is liable for damages if the sacks, in the course of being hoisted, break and a bystander is injured. (*Vogan & Co.* v. *Oulton, supra.*) One who hires out a crane for the purpose of lifting heavy pipes impliedly warrants its suitability for the purpose and may not recover the stipulated rental if the boom of the crane breaks in the course of hoisting the pipes. (*Hoisting Engine Sales Co.* v. *Hart, supra.*)

These authorities make it clear that, if Santo Company had purchased forgings of Bliss Company, for the purpose of machine finishing them in order that it might itself supply the Vickers Company with finished shells, under a contract with that company similar to the contract between Vickers Company and Bliss Company, Bliss Company impliedly would have warranted the forgings to be suitable for machine finishing. We can perceive no difference in that Santo Company was to machine finish for its bailor, rather than for a purchaser from itself on whose account it had bought the forgings.

The case of *Mowbray* v. *Merryweather* (1895, 2 Q. B. 640) seems much in point. There a firm of stevedores con-

tracted to discharge a cargo from a ship. The owner of the ship agreed to supply all necessary cranes, chains and other gearing reasonably fit for the purpose. One of the chains supplied was defective. It broke while being used, and, in consequence, a laborer was injured. The stevedores were compelled to pay damages to the laborer, who was one of their employees. It was held that the owner of the ship had impliedly warranted that the chain was suitable for the work in hand and was liable, upon his warranty, to reimburse the stevedores for the damages which they had paid. The only difference between the case cited and the case at bar is this: There the loan was of a tool, so that the borrower might perform work for the lender. Here the loan was of an article to be worked upon by the borrower, for the benefit of the lender. We think that, as in the one case, there was a warranty of the suitability of the tool to perform the stipulated work, so, in the other, there was a warranty that the article loaned was suitable to be worked upon, for the performance of the contract stipulation.

The learned referee expressed the opinion that while the forgings were difficult to machine, they were not unmachineable. His view seems to have been that if the forgings were machineable by any process whatsoever, no matter how dfficult and expensive that process might be, Santo Company was obligated to perform the work. Impliedly, the admission is made that Bliss Company did warrant that the forgings could, by some method, be machined. We think that the warranty attaching was a promise that the forgings were machineable, not by extraordinary, but by ordinary means. The warranty in such a case is that the articles are " reasonably fit for the purposes for which they were intended " (*Heath Dry Gas Co.* v. *Hurd, supra*); that they are " reasonably suitable for such use as was contemplated " (*Kellogg Bridge Co.* v. *Hamilton, supra*); that they are " reasonably fit " (*Jones* v. *Just, supra*). To the same effect are the

following: *Vogan & Co.* v. *Oulton (supra)*; *Hyman* v. *Nye & Sons (supra)*; *Fowler* v. *Lock (supra)*. Clearly, that which is " reasonably " fit to be manufactured, so that it will assume a particular shape and finish, must be fairly adapted to methods of manufacture commonly practiced. The forgings, as supplied by Bliss Company, were not, in their then condition, machineable. They became machineable, in some instances, when Santo Company, at great expense of time and money, had subjected them to a heat treatment. Even then they were machineable with difficulty. Under these circumstances we do not think that it can be said as a matter of law that the forgings, as furnished, were " reasonably fit and proper " for machining.

The learned referee was likewise of the opinion that the difficulties in the way of machine finishing constituted no defense for the non-performance by Santo Company. He said: " When one has made an unconditional agreement, however, difficulty of performance is not a defense for non-performance." He overlooked the fact that, while impossibility of performance is ordinarily not a defense, such is not the case where the impossibility or difficulty of performance arises directly or indirectly from the acts of the promisee. (*Dolan* v. *Rodgers,* 149 N. Y. 489; *Patterson* v. *Meyerhofer,* 204 N. Y. 96; *Cameron-Hawn Realty Co.* v. *City of Albany,* 207 N. Y. 377.) In *Dolan* v. *Rodgers (supra)* it was said: " This is upon the principle that he who prevents a thing from being done may not avail himself of the non-performance, which he has, himself, occasioned, for the law says to him, in effect: ' This is your own act, and, therefore, you are not damnified.' " In *Patterson* v. *Meyerhofer (supra)* it was said: " In the case of every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." It is said by Story in his work on Bailments (§ 425) that

where an employer hires another to do work for him there is an obligation " to do everything on his part to enable the workman to execute his engagement." In this instance, Bliss Company must have been well aware that the forgings furnished by it were machineable with great difficulty. It created the difficulty by manufacturing forgings, to be supplied, which possessed a tensile strength, elasticity and elongation which were unnecessarily high. No such qualities were required to be present in the finished shrapnel shells which it had agreed to supply to Vickers & Co. Needlessly and purposely, then, it burdened the work to be performed by Santo Company with difficulty and hardship. If Santo Company could not perform because of the difficulties created by Bliss Company, the latter company should not be heard to complain.

We think it plain that Bliss Company impliedly warranted that the forgings furnished would be reasonably fit for machine finishing. Ample proof was given by the appellant that the forgings were not thus suitable. On the other hand, proof was given by Bliss Company that it had found, by its own experience, that similar forgings were readily machineable. There was thus created a fair question of fact. It becomes necessary to inquire, therefore, whether the referee improperly excluded proof which might have elucidated the issue.

There was excluded by the referee evidence offered by the appellant that the forgings were not commercially machineable; evidence to show the effect of using chrome in steel; evidence to show what efforts Santo Company made to procure tools sufficiently hard to cut the forgings; evidence to show that other subcontractors for Bliss Company, in the manufacture of three-inch Russian shrapnel bodies, had had a similar experience as did Santo Company with similar forgings furnished by Bliss Company; evidence to show that these subcontractors, because of the hardness of the metal, were able to machine finish only a small percentage of the forgings contracted to be

machined. The witness Booth testified that the forgings were absolutely unmachineable in a commercial sense. He was asked: "What do you mean by commercial sense?" He answered: "Regardless of expense there might be a way devised either by using abrasive wheels or using special tools of some sort at a great expense and regardless of time and material might be removed but not commercially practicable." The testimony thus given was stricken out upon motion, and to the ruling an exception was taken. We think that the referee was in error in excluding the evidence to which we have referred. In regard to the exclusion of proof offered concerning the experience of other subcontractors, this may be said: If proof by Bliss Company that it had successfully machined similar forgings was sufficient to create an issue of fact upon the question of machineability, then certainly proof as to the experience of others with forgings of an identical character was likewise material. On the other hand, if the proof given by the Bliss Company was not material, then there was no issue of fact as to machineability and the appellant was entitled to dismissal.

The appellant, in addition to claiming that Bliss Company violated an implied warranty that the forgings supplied would be reasonably suitable for machine finishing, also asserted that the forgings furnished were not the articles described in the contract. The articles agreed to be machine finished by Santo Company were "three inch (3″) Russian shrapnel bodies." The appellant sought to prove that the expression "Russian shrapnel bodies" possessed a peculiar trade significance; that in the manufacturing world it was well known that such bodies were fabricated not from chrome but from carbon steel; that they were known to possess a maximum of tensile strength, elasticity and elongation which was far less than was possessed by the forgings which Bliss Company supplied. It cannot be said, as a matter of law, that the phrase had not a peculiar trade significance; neither can it be said

that Russian shrapnel bodies, as that phrase is understood in the trade, were not composed of a metal which, in respect to tensile strength, elasticity and elongation, was restricted to a certain maximum. That the phrase did have a peculiar trade significance was precisely what the appellant essayed and was forbidden to show. Thus, a witness was asked: " Were the characteristics of a Russian shrapnel body known to the trade generally in 1915 and 1916? " He was then asked: " What is that characteristic of? What does it show? " The witness was not permitted to answer the questions. Other witnesses were asked similar questions, but they were similarly precluded from answering. We think that in respect to these rulings the learned referee was likewise in error.

The order of the Appellate Division and that of the Special Term should be reversed and a rehearing ordered, with costs to abide the event.

CARDOZO, Ch. J., POUND, CRANE, LEHMAN, O'BRIEN and HUBBS, JJ., concur.

Orders reversed, etc.