Alexander Del Giorno, J.
This is a claim to recover damages for personal injuries sustained by claimant as a result of a fall while on roller skates at the Jones Beach State Park roller skating rink. The action is predicated upon an implied warranty that the skates rented to claimant were fit and suitable for the particular purpose for which they were intended to be used, and upon the alleged negligence of the State in that it failed properly to inspect, test and examine the skates rented, resulting in the furnishing of a defective skate to claimant.
*638 The claim had been filed originally in the name of the claimant by her mother as guardian ad litem. Before the trial, however, claimant had attained her majority and had married, and on motion duly made at the time of trial the title of the claim was amended accordingly. The claim has not been assigned.
Claimant testified that on September 5, 1954, when she was 20 years of age, she went to Jones Beach roller skating rink with her brother Edward. While she was certain that the visit was in the afternoon of that day, she was not sure whether the time was 2:00 p.m., 4:00 p.m., or 5:00 p.m. They paid the admission fee and proceeded to the skate house, where she rented a pair of skates from an attendant at the counter, who first asked the size of her shoe and then gave her the skates. The skates were clamp skates and had fiber wheels. She then proceeded to a bench on the other side of the skate house, where she put on the skates, which had prongs in front, permanent attached straps in the rear and straps to tie each foot in front, all of which she used. She had skated previously, since the time she had been eight years old, and had done a great deal of dancing on skates. She had not, however, used the skating rink at Jones Beach. She then followed her brother, who had preceded her to the rink. She stepped out onto the entranceway to the rink and then onto the rink. When she was upon the rink she led off with her right foot and started to skate. As soon as she commenced skating she felt something was wrong with the skates, that they felt “ a little funny, peculiar ”. When she had progressed about 15 feet the right skate swerved, and she decided to turn the skates in. Because there were “enough” people coming in the direction of the skating, she could not go between them to get back. She skated slowly toward the skate house in the back of the rink, in the direction in which she had been going previously, going about half way around the rink, and while doing so, the front truck of the right skate came off, her foot gave way underneath her and she fell, her right leg twisting to the right. As she sat down on the rink, with her leg in front of her, she saw the wheels rolling in front of her. The rest of the skate remained firmly on her foot. She had been on the rink for two minutes before she fell. Her brother came to her and called a guard, who took off both her skates while she was sitting on the rink, then obtained a wheel chair, placed her in it and took her to the first-aid station. A nurse and a nurse’s aid lifted her up to an examining bed. In the meantime, her brother went to call her mother and her grandfather, who *639 were not on the rink premises but had gone to get their car to go home. In the first-aid station, she was in pain from a few minutes after the accident, and her leg was placed in a splint. When her mother arrived, she was advised to call her family doctor and after she had done so, the nurse administered morphine to claimant. The grandfather then drove claimant to their family doctor in Jackson Heights. Subsequently claimant was confined to bed for two or three weeks and wore a soft cast placed upon her leg from toe to thigh by the family doctor, Dr Dally, and then a hard cast which she wore for six weeks. She did not work for two months at her usual occupation, although she was paid. Her leg continued to hurt her for some time thereafter. The leg was bound with bandage and she used a cane for three additional weeks.
On cross-examination, she stated that as she was putting on the skates, they seemed to be all right and firm, that she used a skate key to tighten the clamps and tightened the straps. Although the skates felt “ funny ”, she reasoned that they were of a type different from that to which she had been accustomed. As she came out of the skate house, she saw a rail, which she took some steps to get past. She saw some benches in the center of the rink, separating the inner from the outer rink, forming a barrier between the inner and outer rink, which were not accessible to her.
Mr. Leo Monte, who had been in the business of repairing skates for 25 years, testified that the skate used by claimant on the date of the accident was a 1 ‘ Chicago Rink Skate ’ ’. In describing the mechanism of the skate, he stated that the wheels are on a truck, which is held by a bolt known as a kingpin in the center of the truck, which has a hole in it. The kingpin goes through the hole and screws into a lock nut, the purpose of which is to tie the kingpin to the hanger, which is attached to the footplate with rivets. All these parts are held together by this lock nut. The lock nut may be loosened by vibration, or by the failure of the repairer of the skates to lock it. He testified that if the lock nut was not properly locked, a considerable amount of skating would be needed to provide sufficient vibration for it to open. The lock nut must be tightened with a wrench, and if it is, the kingpin cannot be screwed out. He stated that for the accident to have happened, the lock nut would have had to be loose and the kingpin to have fallen out. As an operator of a skating rink, he testified that when skates are returned after having been used, an experienced man can tell, almost invariably, just by looking at it, if a lock nut is loose. On cross-examination he stated that the kingpin must *640 have been on its last thread for this accident to have occurred. He said that an experienced skater could have noticed that the skate was wobbly. On redirect, he testified that if the lock nut were locked properly, even if it were in the last thread, it would tear the threads off the kingpin or out of the hanger, and that he could not tell if this could occur in a skated distance of 10,125 or 1,000 feet.
The State’s skate expert, Jack J. Adams, a distributor of the Chicago Roller Skating Co. for 37 years, testified that the skate used by claimant was “7% loose ” and “ 3% holding” and that one putting it bn would notice the situation and would “ wobble ” while skating, although he could proceed with skating. He stated that the only way the truck could come off would be for the kingpin to break.
Edward, the brother of claimant and a college student, testified that his sister and he arrived at the rink at between 4:00 p.m. and 4:30 p.m. He preceded her onto the rink, and when he had proceeded about three quarters of the distance around the rink, he saw his sister fall. When he went to her he found her on the ground with the front truck of her skate out in front of her. He called a guard, Mr. Tinston, and reported to him what had happened. The latter went back with him to claimant, and obtained a wheel chair for her. Edward saw that part of the skate was still on claimant’s foot. After that time, he did not see the front truck of the skate again.
The testimony of claimant’s medical expert, Dr. Daily, and the State’s medical expert, Dr. Sansone, indicates that there was a complete spiral fracture of the right fibula bone about 3" above the ankle joint. The State’s expert stated that in addition to the claimed injuries, there was a fracture of the internal malleolus. The court thereupon permitted an amendment of the claim so as to include this item. As to the malleolus injury, there was 75% healing, with no remaining detriment to proper leg function. With respect to the fibula fracture, both doctors agree that there was good healing. Dr. Dally testified that there was an increase in circumference of %" above the ankle joint and %" at the ankle joint, and that the injury is permanent; Dr. Sansone testified that the right ankle was %" greater in circumference than the left and that claimant would have been disabled for 8 to 10 weeks and partially disabled for another 4 weeks. Dr. Daily’s bill amounted to the sum of $135.
At the close of claimant’s case, the State moved for dismissal for failure to make out a prima facie case. Decision was reserved.
*641 State’s witness Tinston testified that on the date of the accident, he acted as foreman in charge of the skate house; that he went to claimant after she had fallen, removed her skates and helped her to a bench, later taking her in a wheel chair to the first-aid station. He took the skates to a rear room of the skate house, wrapped and tagged them. He did not look at the skates on either occasion. After writing his accident report, he did examine the skates, finding one perfect and the other with a loose front truck. He explained that after patrons pay the fee, they are given a pair of skates; when the skates are returned, the park employee receiving them examines the wheels and shakes the skates to see if there are any loose parts; a mechanic is on duty who also has the task of tightening any loose skate. He said that in the four years he had been at the park, no accident similar to this had occurred. On a diagram of the rink he marked with an “X” the spot where claimant fell; he said that at the time there were 60 to 80 people on the rink and that the spot where claimant fell was about 200 feet from the skate house. The accident report confirms the accident and also that claimant had told him that her skate had come apart. He stated he had never seen the mother of claimant, and that he had never told the mother that claimant had had an accident and that the front truck of her skate had fallen off. The first-aid report, signed by claimant, states that while claimant was skating, the front wheels of the right skate fell off, causing her to fall. The witness stated that the mechanic on duty would repair only those skates called to his attention by the park employee on duty.
Rebuttal testimony on behalf of claimant was offered by Marion E. Sayre, her mother, who said she had been called to the first-aid station after the accident, and that Mr. Tinston told her claimant had had an accident on the rink, and that her skates had broken, the wheels coming off.
Mr. Raymond Ducker, foreman of the games area, was not present when the accident occurred, because he was on night duty at the time. He stated that in accordance with the usual procedure, the skates used by claimant were taken out of circulation and that he ticketed them. The instructions to attendants are that no skates are to be rented if defective in any way, and that after use, all skates are to be looked at and shaken. If they are taken out of circulation the mechanic looks at them, and also inspects them twice a week generally. The kingpin is tied down tight and locked with a lock nut. He said he had never seen wheels come off. He had seem them *642 come loose, but not so much as to be dangerous. He did not know if the skate had been inspected according to the rules.
State’s, witness Davis testified simply that at the time of the occurrence, he had been an attendant with various duties including the wrapping of skates. He did not remember what his duties were on that day, only that he was in the skate house issuing and receiving skates. He did not recall what he did specifically. He assumed the skates had been inspected when he handed them out, as they are inspected when they are returned.
State’s witness Hall testified that on the day of the accident he had been an attendant at the skate house. He did not recall the accident, nor what his duties were, except that he gave out and received back skates. He said a skate similar to the one involved herein would never have been issued.
State’s witness La G-rego testified that he had been a cashier at the rink on September 5, 1954, and that he knew nothing about the accident.
At the close of the trial, the State renewed its motion for dismissal, upon which motion decision was reserved. A motion made by claimant to amend the claim so as to increase the amount claimed from $15,250 to $25,000, opposed by the State, was denied.
During the pendency of this proceeding and before the trial, claimant moved to amend its claim so as to set forth, in addition to the original claim based on negligence, a claim for the breach by the defendant of the warranty of fitness for use arising out of the agreement of hire of the skates, in that the skates were defective and dangerous and were not fit for use as such. The motion was granted. On appeal the order of the Court of Claims was affirmed.
In the operation of the roller skating rink at the park, the State rented skates to patrons for use upon the rink. Claimant paid the entrance fee to the rink, was given a pair of skates and used them. Thus there was created a bailor-bailee relationship for mutual benefit. The implication of a warranty of fitness for use arises in cases of bailment as well as in sales. (Matter of Casualty Co. [Bliss Co. Claim], 250 N. Y. 410, revg. 222 App. Div. 304.)
In the case of Hoisting Engine Sales Co. v. Hart (237 N. Y. 30, 36) the leading case on the subject, the court held: “ By analogy there is an implied warranty in the hiring or bailment of certain kinds of property.” Pointing out that in the hiring of a horse there is an implied warranty that he is fit for the *643 purpose for which he was taken, that in the hiring of a carriage there is a warranty that it will not fall apart and that in other cases certain articles were warranted.fit and proper for the use intended, the court continued (p. 37): “In Hals-bury’s Laws of England (Vol. 1, sec. 1117) we find this: ‘ The owner of a chattel which he lets out for hire is under an obligation to ascertain that the chattel so let out by him is reasonably fit and suitable for the purpose for which it was expressly let out, or for which, from its character, he must be aware it is intended to be used: his delivery of it to the hirer amounts to an implied warranty that the chattel is in fact as fit and suitable for that purpose as reasonable care and skill can make it.’ ”
In the case of Matter of Casualty Co. (Bliss Co. Claim) (250 N. Y. 410, 417, supra) the court held: “ Thus, one who lets property for hire impliedly warrants that it is suitable for the purpose for which it is hired and is liable for the damages which may result from its unsuitability. (Williston on Contracts, § 1041; Vogan & Co. v. Oulton, 81 L. T. Rep. 435; Hyman v. Nye & Sons, L. R. 6 Q. B. D. 685; Fowler v. Lock, L. R. 7 C. P. 272; Hoisting Engine Sales Co. v. Hart, 237 N. Y. 30.) ” Further, a dealer, as well as a manufacturer, may be held liable for concealed defects, and may be held to have warranted impliedly that a machine which it leased was reasonably safe and suitable for the use intended. (Gambino v. Lucas & Co., 263 App. Div. 1054.)
In its excellent brief, the State claims that “ allegations of negligence so permeate the claim that the rules of negligence apply” and poses the question whether the rink has warranted only that it has exercised reasonable and prudent care to see that the skate was fit for skating, in which event the standards of reasonable care as used in the rules of negligence would apply. The court holds that insofar as the claim alleges breach of implied warranty by the State, the rules of negligence do not so apply to determine if the State’s duty has been breached and if such breach was the proximate cause of claimant’s damage. When the Avords “reasonably fit and suitable for the purpose ” are used, they are so used to denote the fitness of the chattel for the purpose for which it is to be used; they do not refer to a standard of care to be exercised. ‘1 The warranty in such a case is that the articles are ‘ reasonably fit for the purposes for which they were intended ’ (Heath Dry Gas Co. v. Hurd, supra); that they are 1 reasonably suitable for such use as was contemplated ’ (Kellogg Bridge Co. *644 v. Hamilton, supra); that they are ' reasonably fit ’ (Jones v. Just, supra) ” (Matter of Casualty Co. [Bliss Co. Claim], 250 N. Y. 410, 418, supra).
Claimant testified that after she fell, she saw the truck of the skate, with the front wheels detached from the rest of the skate, on the ground in front of her and so stated in the accident report. State’s witness Tinston, the rink attendant, who came on the scene later, said he found the truck attached to the skate but loose. He admitted that claimant had told him at the time of the accident that her skate had come apart, causing her to fall. On the evidence, the court finds that the front truck of the skate came off the skate.
The court finds further that claimant found nothing wrong with the skate when it was handed to her by the park attendant, although she looked at it before putting it on, and that it would be unreasonable under all of the circumstances to expect her to have done more than she did. As to her proceeding on the skate although it felt ‘‘ funny ’ ’ to her for the distance she did travel, the court cannot consider this as disregard of any existing condition in the skate, in view of the prevailing rink conditions and in view of what the court deems natural and normal behavior.
The expert opinions rendered indicate to the court that the skate was defective at the time it was given to claimant by the attendant.
On the question of inspection of the skate by the State, the evidence discloses that when skates are returned by patrons, the procedure at the rink is that an employee is instructed to examine them to see that the fixtures are intact, then to shake them to make sure they are not loose; if they are loose they are to be put on a rack and are to be repaired by mechanics; the skates are to be checked once or twice weekly by the mechanics. The witness Tinston did not examine the skates and did not know who inspected them on his shift of duty or on the earlier shift or whether they were inspected. State’s other witnesses did not inspect, nor was anyone from an earlier shift called to testify.
The court holds that the State extended to claimant an implied warranty that the skates hired by her were reasonably fit for the purposes for which they were hired, and that the State breached such warranty.
Upon all of the evidence adduced, the court finds that the State was guilty of negligence and that the claimant was free from contributory negligence. To do otherwise would be tanta *645 mount to holding that the mere existence of rules and regulations as to inspection, rather than the adherence to such rules and regulations by the State, should exonerate the State. The court finds that there was no evidence whatever as to compliance by the State’s employees with such rules and regulations.
The court awards to claimant for the personal injuries sustained by her, and for her medical bills, the sum of $5,500, for which amount judgment is directed to be entered.
All motions heretofore made by the State on which decision was reserved are hereby denied.
This constitutes the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act.