EKCO PRODUCTS COMPANY
v.
The UNITED STATES.
No. 464–57.

United States Court of Claims.
Jan. 11, 1963.
Rehearing Denied March 6, 1963.

Robert L. Stern, Chicago, Ill., for plaintiff. Erwin C. Heininger and Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., were on the briefs.

David V. Anthony, Washington, D. C., with whom was Joseph D. Guilfoyle, Acting Asst. Atty. Gen., for defendant.

DURFEE, Judge.

This is an action to recover damages for breach of contract. Plaintiff agreed to manufacture cartridge cases for defendant, and defendant agreed to furnish plaintiff with certain machines necessary for this manufacturing. Plaintiff claims that the machines so supplied by defendant were unfit for the purpose intended, thus causing plaintiff delay and extra expense.

Ekco Products produces metal housewares and engages in considerable defense work for the United States Government. During World War II and the Korean War, Ekco made various sizes of cartridge cases for defendant. A cartridge case is that portion of an artillery shell which holds the explosive charge and firing device. The projectile is fitted into the open end of the case. Each manufacturing project carried out by plaintiff for defendant is usually governed by two contracts, a supply contract and a facilities contract. The supply contract contains the agreement by plaintiff to manufacture a certain item. The facilities contract is an agreement by defendant to supply plaintiff with machinery necessary to make the item. A single facilities contract may be amended to provide machinery for subsequent supply contracts, as was the case in this litigation.

In October 1954 the Navy Department requested plaintiff to submit a proposal for the production of one million 40 mm. cartridge cases. Plaintiff made an offer to manufacture these cases and stated that it would require additional machinery for the job. Plaintiff proposed that Facilities Contract NOrd (F) 1486, already in force between plaintiff and defendant, be amended to provide for the procurement and installation of five New Britain Head Turning Machines and an Ajax Electric Heat Treating Furnace as well as other facilities. In the event defendant wished to furnish this machinery from Government reserve, plaintiff stated that it would demand the opportunity of prior inspection and acceptance, and the necessary funds to rehabilitate and install these facilities. Shortly after receiving this offer, Navy officials advised plaintiff that the additional machinery would be supplied from Government reserve.

In November 1954, Mr. Didriksen, plaintiff's comptroller, and Mr. James E. Carroll, Ekco's employee in charge of the 40 mm. project, visited the Bureau of Ordnance in Washington, D. C. to determine what machinery was available in Government storage suitable for the proposed contract. They conferred with Mr. John W. Nelson, Chief of the Machine Tools and Production Equipment Section. This section maintained records on each piece of machinery the Navy owned, classifying them according to type, condition, location, etc. During this initial conference plaintiff was advised that the Government would make available for plaintiff's use the requested facilities, includ-

ing one new Ajax Electric Heat Treating Furnace, located in Detroit, and five New Britain Head Turning Machines, classified as in O-2 condition on the records kept in Mr. Nelson's office.

On December 16, 1954, plaintiff submitted a second offer to the Navy Department revising the total cost downward. As to the additional equipment to be put at plaintiff's disposal, this revised offer stated:

"We also request the right to inspect and accept these additional Schedule B facilities prior to shipment to our plant and we have been informed that the Government owned equipment is in workable order for this manufacture."

On January 13, 1955, plaintiff was awarded the contract on the basis of its revised offer. Supply Contract NOrd 15,579 was thereupon executed under which plaintiff agreed to manufacture the cartridge cases at the unit price of $1.446. On January 25, 1955, Amendment No. 8 was added to Facilities Contract NOrd (F) 1486 to provide that defendant would furnish the additional machinery needed to make the 40 mm. cases. Defendant also agreed to bear the costs of installation and rehabilitation of the facilities given under this amendment; the estimated cost of rehabilitation was stated at $10,250.00.

The original plan under the contracts called for the first delivery of cartridge cases in June 1955 and the final delivery five months later, in October 1955. Production did not begin, however, until September 1955 and it was not completed until June 1956, ten months later. Plaintiff alleges that this delay, and its resulting expenses, were caused by the failure of the Ajax Electric Heat Treating Furnace and the New Britain Head Turning Machines to do the job that they were intended to do. More precisely, plaintiff charges defendant with a breach of a warranty of fitness on each of these machines.

Whether or not any such warranty existed in respect of the Heat Treating Furnace we need not determine. There is sufficient evidence that plaintiff's difficulties with this facility were largely its own doing.

Shortly after Amendment No. 8 to the facilities contract was made on January 25, 1955, plaintiff's employees made an inspection of the furnace in Detroit. They determined that parts of this apparatus were missing and that they would be required under plaintiff's production plans. Plaintiff was under the impression that all the components of the furnace it would need were in Detroit and included within Amendment No. 8. Plaintiff notified defendant on February 10, 1955 of its understanding in this regard and requested defendant to supply the additional equipment necessary. On April 14, 1955 defendant executed Amendment No. 9 to the facilities contract, NOrd (F) 1486, authorizing Ekco to acquire and install at defendant's expense, every item plaintiff requested in its letter of February 10. In the meantime, all the furnace parts in Detroit were shipped to Ekco's plant in Chicago, Illinois.

Ekco's order to Ajax for the additional furnace parts was dated May 18. Plaintiff argues that there is no evidence that this one-month period between the Navy's authorization and Ekco's purchase was unduly long. On the other hand, there is no evidence to the contrary. Plaintiff knew what it wanted on February 10th. It received authorization to purchase at the Navy's expense on April 14th. Plaintiff should have presented some evidence as to why it waited until May 18th to order the parts. It did not do so.

There is a conflict between the parties as to when the furnace sections ordered from Ajax were delivered to Ekco. The parts arrived either on an early September date or on September 29th, or possibly on both dates. The Ajax furnace was a novelty to plaintiff's personnel; they had had no previous experience with the contraption. Outside assistance for the assembly and installation of the furnace was procured some time in October.

There is, consequently, evidence that Ekco delayed nearly two months in obtaining such outside help after the delivery of the parts from Ajax. The assembly and installation of the furnace were not completed until January 9, 1956, almost nine months after defendant authorized the additional parts.

■ It is our conclusion that lack of experience and undue delay contributed to plaintiff's losses, if any, in this regard. Defendant is not to be charged with these shortcomings. Once the furnace was installed it performed its functions properly; at least we have not been informed otherwise.

Ekco's problems with the Head Turning Machines were of a different nature and more serious. As we have noted, plaintiff's representatives, Mr. Didriksen and Mr. Carroll, visited the Navy Bureau of Ordnance in Washington, D. C., in November 1954 to discuss the contract and to determine what machinery the Navy would make available to Ekco. At that time, Mr. Nelson, Chief of the Machine Tools and Production Equipment Section, informed plaintiff that defendant could supply Ekco with five New Britain Head Turning Machines, all in O–2 condition. Mr. Nelson explained that his office has a file card on each machine tool owned by the Navy, and that besides the other information recorded thereon, the condition of the machine is noted by the use of code symbols. The symbol N–1 describes a new machine in perfect condition; R–4 describes a machine in poor condition needing major repairs. A machine in O–2 condition is "used property, more worn than O–1 but still in good condition with considerable use left before any important repairs would be required." Other than explaining the meaning of the code, Mr. Nelson made no representations as to the condition of the Head Turners. He had no other knowledge as to their condition except that which was given to him by the symbols on the file cards.

It was after this meeting with Mr. Nelson that plaintiff submitted its second offer to the Navy on December 16, 1954, and again requested the right to inspect and accept the facilities to be furnished by defendant. And as we have noted, plaintiff stated in its second offer that it has "been informed that the Government-owned equipment is in workable order for this manufacture." The contracts were executed in January 1955, plaintiff agreeing to produce the cartridge cases, and defendant agreeing to supply the Head Turning Machines plaintiff needed at its plant.

We must decide whether the arrangements thus agreed upon between the parties imposed a warranty obligation on defendant as to the condition of the machines. Was there a warranty of fitness for use on the facilities? There is no express warranty stated in the contracts between the parties. Nor is there any disclaimer of warranty in either contract. If a warranty existed, then, it must be implied. If the warranty is unavailable to plaintiff in this litigation, it must be because of subsequent actions of the parties, not because of anything stated in writing in the supply and facilities agreements.

■ Defendants owned and kept title to the Head Turning Machines during the entire period of production. Use and possession of the facilities, however, were given to plaintiff. The bailor-bailee relationship thus created was for the benefit of both parties. Defendant was able to induce plaintiff to accept the contract obligations and manufacture the cartridge cases; plaintiff expected to receive its profit upon successful completion of the contract. The law applicable to this situation is clear. Where there is a bailment for the mutual benefit of the parties, there is imposed on the bailor, in the absence of a special contract or representation, an obligation that the thing or property bailed for use shall be reasonably fit for the purposes, or capable of the use known or intended.[1] There

1. Aircraft Sales & Service v. Gantt, 255 Ala. 508, 52 So.2d 388 (1951); In re People, by Phillips, 250 N.Y. 410, 165 N.E. 829 (1929).

is no question in this case but that plaintiff needed these machines to manufacture the cartridge cases, and that defendant gave the machines to plaintiff expressly for this purpose. Whether the O-2 symbol created a warranty is unimportant to decide; the arrangement itself between the parties gave rise to the warranty on the machines. The conversation pertaining to the file cards in Mr. Nelson's office simply demonstrates more clearly that plaintiff and defendant had the proposed use for these machines fixed in mind.

Given the warranty, defendant asserts that it is inoperative because plaintiff never intended to rely on it, or because plaintiff, by its conduct, forfeited its rights under the guarantee.

■ Plaintiff reserved the right to inspect and accept the Head Turners before installation. But by inspection plaintiff was able to determine very little, if anything. The machines were covered with cosmoline, a protective grease, which could not be conveniently removed until the machines were delivered to Ekco. From the evidence it is clear that it was almost impossible to determine whether the machines would do their job properly until they were actually installed in the production line and put into operation. Mr. Karzel, Ekco's engineer, reported from his inspection that the Head Turners were "in fair condition" and that after cleaning, they "should be checked for wear and repaired where necessary." Mr. Nelson stated that the machines were in good condition, needing no "important repairs." These statements do not conflict. Mr. Nelson interpreted the O-2 symbol to mean that the machines would do the job without *major* repairs. Mr. Karzel didn't discover or report differently. Under the circumstances, we are constrained to hold that the right of inspection and acceptance exercised by plaintiff did not defeat the warranty of fitness.[2]

Defendant argues that Ekco did not demand better machines during the negotiations or the actual production of the cartridge cases. The fact is, better machines were not available. Plaintiff was only gaining use of the Head Turners; it was not purchasing them. The Navy was to pay for their installation and repair. Under these circumstances, we can only assume that plaintiff would have requested and received better facilities if the Navy had had them. The Government's witness, Mr. Nelson, testified that O-2 was the best he could supply plaintiff. There is no evidence to the contrary.

■ The O-2 condition itself does not detract from the warranty of fitness because, as Mr. Nelson explained, O-2 means that the machines are in good condition and need no important repairs. This must mean, at least, that they can do the work for which they were built. The $10,250 estimated for rehabilitation was provided by defendant to repair all of the machines included within Amendment 8 to the Facilities Contract. Defendant estimates the value of these twenty machines, including the Heat Treating Furnace and the Head Turning Machines, to be over $1,000,000. Obviously, the parties envisioned no more than minor repairs on these machine tools. The $10,250 set aside for repairs, then, cannot affect the warranty.

■ There seems to be little dispute that if a warranty existed, the Head Turning Machines failed to live up to the expected performance. There is abundant evidence that the machines broke down continually during the first four months of use. The more important issues raised by defendant deal with Ekco's failure or inability to correct the trouble, and its failure to notify defendant of the difficulties. Defendant asserts that these factors dispel the effect of the warranty guarantee.

Ekco was unable to determine if the Head Turners would operate properly until production actually commenced in September 1955. When the first few runs were made, Ekco then realized that

2. Railroad Waterproofing Corp. v. United States, 137 F.Supp. 713, 133 Ct.Cl. 911 (1956).

the machines were not ready for full duty. Ekco found itself in this perplexing situation. It did not know the extent of further repairs necessary, nor how long they would take. There were no other machines in better than O–2 condition available to replace the ones it had installed, and if there were, Ekco did not know how long it would take to make the change. For all Ekco knew, the Head Turners might be repaired in just a few days which would end all the trouble, and be far more efficient than trying to replace the Head Turners. And every machine failure throughout the process presented plaintiff with the same situation. It was never apparent at any time that the machines were wholly useless. It was not unlikely that the very next bit of repairing might put the machines into full working capacity. The fact is that by the middle of January 1956, three of the Head Turners were able to function well enough to put the manufacturing process back in proper order.

The argument that Ekco should have notified defendant of the trouble, and thereby given the Government an opportunity to alleviate the situation, simply ignores the weight of evidence presented in this litigation. Mr. Nelson and other Navy representatives knew perfectly well that Ekco was having production difficulties and problems with the Head Turners during these first four months, and yet the Navy prodded Ekco along to complete the work. We are not convinced that the Navy could have done anything to save plaintiff's losses anyhow. Defendant had no machines in better condition to offer plaintiff and the evidence discloses that Ekco acted as quickly and reasonably as it could to put the Head Turners into working condition. Mr. Haas from the New Britain Machine Company, which manufactured the Head Turners, was consulted and his services utilized. Ekco also sought out the Clayton-Lambert Company in Kentucky, the only other manufacturer using these Head Turners, to gain what help it might from that source. We have no evidence that plaintiff's employees themselves were lax or inept in their efforts to solve the problems.

■ Defendant's argument that Ekco should have requested replacements or that it waived its rights under the warranty by its decision to keep the machines, rather than return them as useless, is of no merit under these circumstances. Plaintiff cannot be held to have waived its rights under this warranty by its efforts to repair the machines and complete the contract for defendant. Ekco followed what it reasonably considered to be the most efficient course of conduct to pursue.[3]

Defendant's purported counterclaim, brought up for the first time in its brief to this court, must necessarily fall under the weight of this holding. Defendant asserted that it is entitled to recover damages for plaintiff's failure to properly repair the machines.

■ Defendant's argument that plaintiff failed to pursue its administrative remedies is likewise without merit. This is a claim for unliquidated damages over which, as defendant admits, "the Contracting Officer has no jurisdiction."[4]

We find from all of the evidence that the failure of the Head Turners to perform properly was the central cause of plaintiff's delay and extra expense. This question is not free from doubt as there is some mention in the record of other delaying factors. But there is no dispute over the fact that after the Head Turners were working satisfactorily, production proceeded to completion without further obstruction.

Plaintiff's recovery in this suit is not subject to Renegotiation. By a letter of March 6, 1958, from the Renegotiation Board to Ekco Products Company, defendant agreed that any recovery gained from this proceeding would remain unaffected by Renegotiation.

3. United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1919).

4. Defendant's brief, p. 40; Volentine and Littleton v. United States, 169 F.Supp. 263, 144 Ct.Cl. 723 (1959).

Plaintiff established damages in the amount of $238,582.05, and judgment is entered for it in that amount.

JONES, Chief Judge, and DAVIS, LARAMORE and WHITAKER, Judges, concur.