Bertha A. IRELAND, Plaintiff and Respondent,

v.

William R. CHARLESWORTH, Defendant and Appellant.

No. 7773.

Supreme Court of North Dakota.

Aug. 21, 1959.

Rehearing Denied Sept. 29, 1959.

Philip R. Bangs, Grand Forks, Degnan, Hager, McElroy & Lamb, Grand Forks, of counsel, for appellant.

Conmy & Conmy, Fargo, for respondent.

BURKE, Judge.

By her complaint in this action plaintiff sought a declaratory judgment decreeing that certain letter agreements by which she had agreed to keep in force provisions of her will, granting stock purchase rights to the defendant, were null and void. In his answer the defendant asserted the legality of the agreements and counterclaimed for damages for the breach thereof. With his answer and counterclaim the defendant filed a demand for a jury trial of all of the issues in the case. This demand was rejected by the trial court and the case was tried without a jury. A judgment, decreeing that the contracts were void, and dismissing defendant's counterclaim was thereafter entered. Defendant has appealed from the judgment and demanded a trial anew upon this appeal.

Guy Ireland, the deceased husband of the plaintiff, and R. J. Charlesworth, the deceased father of the defendant, were associated together in the lumber business under the corporate name Ireland's Lumber Yard for a period of almost forty years. Mr. Ireland owned controlling stock in the corporation and was its president and general manager. Mr. Charlesworth was the principal assistant to Mr. Ireland and the owner of a substantial amount of stock in the corporation. In December 1952 Mr. Ireland died. At the next stockholders' meeting, held in January 1953, R. J. Charlesworth was elected president and general manager of the corporation and Bertha A. Ireland, the plaintiff, herein was elected secretary-treasurer.

Thereafter the responsibility of the management of the business and the direction of its policy were given to R. J. Charlesworth. Mrs. Ireland who had become the majority stockholder had great confidence in his business ability and integrity and she relied upon his advice and counsel, not only with respect to the business of Ireland's Lumber Yard, but also with respect to her personal business and investments.

In the spring of 1955, when Mrs. Ireland was 77 years of age, R. J. Charlesworth, after being advised by Mrs. Ireland that she intended to sell the business when he retired, suggested that it would be better to take a young man into the business and train him to succeed eventually to the management. He mentioned his son, W. R. Charlesworth, as a candidate for such training and Mrs. Ireland approved his choice. At that time W. R. Charlesworth was a Lieutenant Colonel in the U. S. Air Force. His pay was about $850 a month, he had had 13 years of service and would have qualified for retirement in another 7 years. R. J. Charlesworth entered into negotiations with his son, during the course of which Mrs. Ireland executed two instruments as an inducement to W. R. Charlesworth to resign his Air Force Commission and enter the employ of Ireland's Lumber Yard.

The first of these was Article 11–A of her last will and testament. This article gave to R. J. Charlesworth an option to purchase, within one year after the death of the testatrix, a sufficient amount of the voting stock of Ireland Lumber Yard to give him control of the corporation. The price per share was to be the book value of the stock payable in twenty equal annual installments without interest. Title to the stock and voting privileges were to be acquired by R. J. Charlesworth at the time of making the first payment but the stock was to be held by the testatrix' trustee as security for the payment of the balance due. All dividends earned by the stock were to be paid to the trustee and credited to the purchase price. In the event the

dividends exceeded the amount due in any year the excess was to be credited to payments to come due in subsequent years. It was also provided that, in the event of the death of R. J. Charlesworth, his son, W. R. Charlesworth, should succeed to the right to the option. The second instrument is a letter addressed to Mr. Robert J. Charlesworth and Mr. William Robert Charlesworth dated August 31, 1955. This letter is Exhibit A. in the record and it reads as follows:

"In consideration of William Robert Charlesworth entering into the employ of Ireland's Lumber Yard and preparing himself to become active in the management of said corporation, I agree that so long as he shall continue in said employment, I will keep in full force and effect as a part of my last will and testament a provision substantially in the following terms: (setting forth Article 11–A of the will above described)

"Yours very truly,
"(signed) Bertha A. Ireland"

The minutes of the meeting of the Board of Directors of Ireland's Lumber Yard, dated August 30, 1955, show the following:

"For some months B. A. Ireland and R. J. Charlesworth had been corresponding with William R. Charlesworth regarding William R. Charlesworth resigning his commission in the United States Air Force and coming into Ireland's Lumber Yards as assistant to R. J. Charlesworth. It being the desire of B. A. Ireland and Ireland's Lumber Yard continue in operation rather than being offered for sale when R. J. Charlesworth should decide to retire. R. J. Charlesworth stated that William R. Charlesworth had advised him that he had presented his resignation to the Air Force and was accepting the offer of Ireland's Lumber Yard and expected to be ready to assume his duties with Ireland's the early part of October 1955. Upon motion of

B. A. Ireland and second of R. J. Charlesworth, the President of Ireland's Lumber Yard was authorized to arrange for William R. Charlesworth to start work as soon as he became available, also that the President be authorized to arrange salary and duties for said William R. Charlesworth. This motion was passed by the Board.

"R. J. Charlesworth then discussed with the Board of Directors the sale of certain amounts of Ireland's Lumber Yard Preferred, Common Voting and Non-Voting Common Stock from Treasury Stock. Upon motion of B. A. Ireland, second by J. H. Bakke, the President, R. J. Charlesworth was authorized to sell to William R. Charlesworth any time between this date and December 31, 1955, the following stock of Ireland's Lumber Yard:

| | | |
|---|---|---|
| 270 shares voting common | $20.50 per share | |
| 100 " non-voting common | 20.50 " " | |
| 25 " preferred | 100.00 " " " | |

Thereafter W. R. Charlesworth resigned from the Air Force, returned to Grand Forks and entered into the employment of Ireland's Lumber Yard on October 10, 1955. The minutes of the meeting of the Board of Directors of the corporation held November 10, 1955, show the following resolution:

"* * * Resolved that beginning immediately the signature of William R. Charlesworth also known as Wm. R. Charlesworth shall be authorized together with any other authorized signature on checks drawn by Ireland's Lumber Yard. * * *."

At the stockholder's meeting held January 16, 1956, W. R. Charlesworth was elected a director of the corporation. The minutes of a meeting of the Board of Directors held the same day show the following:

"The Board directed that the President have full authority to set wages and salaries as he thought best for efficient operation and to act as General Manager with the assistance of William R. Charlesworth."

At a meeting of the Board of Directors held January 16, 1956, William R. Charlesworth was elected Vice President and Assistant to the General Manager of the corporation.

In November 1956, B. A. Ireland, with the advice and consent of R. J. and William R. Charlesworth, executed a codicil to her will which amended Article 11–A of the will above referred to. This amendment did not affect the stock purchase option contained in the original will, but granted a stock purchase right to other employees after the requirements of the Charlesworths had been satisfied. In January 1957, she wrote another letter to the Charlesworths agreeing to keep the codicil in force "in consideration of your continuing in the employ of Ireland's Lumber Yard."

Sometime early in 1957, R. J. Charlesworth became ill. After March 1, he was physically unable to go to his office. From that time on W. R. Charlesworth acted as manager of the corporation. He consulted with his father daily and had the benefit of his advice upon all important matters relating to the business. Early in July, R. J. Charlesworth's illness had progressed to the extent that he could no longer sign his name. On July 8, upon the request of W. R. Charlesworth, a special meeting of the Board of Directors was held. At that meeting the resignation of R. J. Charlesworth as President and General Manager was presented and accepted. Mrs. Ireland was elected President, W. R. Charlesworth was elected Vice President and designated to serve as General Manager and J. H. Bakke was elected Secretary-Treasurer. On August 1, 1957, R. J. Charlesworth died. On August 30, 1957, Mrs. Ireland transferred 5 shares of voting common stock in the corporation to Edward Rigby, apparently for the purpose of qualifying him to hold the office of Director. At a special meeting of the Board of Directors

held August 31, 1957, Edward Rigby was elected a Director to fill the vacancy of the Board caused by the death of R. J. Charlesworth. At the same meeting W. R. Charlesworth was discharged as Vice President and General Manager and his employment by the corporation was terminated. The reason given for his discharge was that the old employees of the corporation objected to working under the direction of a man who had so little experience in the lumber business and threatened to quit. Among them was J. H. Bakke, an old time employee of the corporation who had been a member of the Board of Directors since 1953, and who, prior to the employment of W. R. Charlesworth, had been second to R. J. Charlesworth in authority and responsibility.

Thereafter Mrs. Ireland revoked the codicil of her will which she had agreed to keep in force, according to her letter of August 31, 1955, "so long as he (W. R. Charlesworth) shall continue in said employment" and according to the letter of January 11, 1957, "in consideration of your continuing in the employ of Ireland's Lumber Yard."

It is Mrs. Ireland's contention here that her action in revoking the codicil after the defendant's employment with the corporation had terminated was not a breach of the agreement contained in the letters for the reason that her obligation to keep the codicil in force ended when defendant's employment with the corporation was terminated. She stated that her understanding with R. J. Charlesworth was that W. R. Charlesworth should be employed and be given an opportunity to make good but that he could leave the employment at any time and the corporation would have the right to discharge him if he failed to make good. She urges that such is a fair interpretation of the contract. She also urges that if the contract be construed as an agreement on her part that she would use her power as the majority stockholder to see to it that the defendant had employment with the corporation as long as she

lived, the contract is against public policy and void.

The defendant takes the view that he received the stock purchase option in consideration of his giving up a career in the Air Force, including his retirement security which was already more than half earned, coming to work for Ireland's Lumber Yard, and continuing faithfully in that employment. He contends that a fair interpretation of the contract, when considered in the light of the circumstances of the parties at the time the contract was made, requires that the stock option granted be continued in force for as long as he performed or was willing to perform his obligations under the contract, and that the other contracting party cannot avoid her obligations under the contract by using her power as a majority stockholder in the corporation to make it impossible for him to continue to perform.

■ The object of construing a contract is to ascertain and give effect to the mutual intention of the parties as it existed at the time of contracting in so far as the same is ascertainable and lawful. Sec. 9–0703, NDRC 1943; Young v. Metcalf Land Co., 18 N.D. 441, 122 N.W. 1101; Baird v. Fuerst, 60 N.D. 592, 235 N.W. 594. The language of a contract governs its interpretation if the language is clear and explicit. Sec. 9–0702, NDRC 1943. A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates. Sec. 9–0712, NDRC 1943; Baird v. Fuerst, supra. Of two or more possible constructions that one must be adopted which would make the contract lawful rather than one which would make it unlawful. Sec. 9–0708, NDRC 1943, Young v. Metcalf Land Co., supra.

The contract in the instant case was originally oral. Before there was any performance on the part of this defendant, however, the part of the contract, relating to the obligations of the plaintiff thereunder, was reduced to writing. The only

testimony in the record as to the negotiations for the contract and the resulting agreement is that of the plaintiff. Referring to a conversation with R. J. Charlesworth she stated:

"The conversation was what did I think of having a young man come into the business to be trained, to work up until he could become manager if he was the right material. Did I think his son, William—no, what did I think of his asking his son, William, to come. I thought it was a fine idea. He said if he can get out of the Air Corps I will write to him and find out if he will come."

The following also appears in the record:

"Q. Did Mr. R. J. Charlesworth later on tell you that he had heard from his son, William, with reference to coming to Grand Forks? A. I asked him more than once, and he said there was a lot of red tape that had to be gone through first, and it would be sometime later in the summer, he told me, his son was coming.

"Q. At that time was there any conversation with reference to a letter of agreement or codicil? A. Oh, yes.

"Q. That was signed by you August 31, '55? A. Yes.

"Q. And you recall that you testified that sometime—I think you said in early August—this letter with a copy of the suggested codicil had come to you in the mail from Mr. Shaft's office? A. Yes, sir.

"Q. After you received this letter, exhibit A, and the codicil did you have any conferences with Mr. Bob Charlesworth with reference to them? A. Yes.

"Q. Will you tell us as briefly as you can, as well as you can, tell us what that conversation was with reference to this letter of August, 1955 and the codicil that is included in the letter? A. It was my understanding with R. J. Charlesworth that Bill was coming.

"Q. Will you try to state the conversation? A. The conversation, I said what if Bill does not make the grade? What if he retires? What if he takes another job? What if he becomes incapacitated to carry on? What then? And Bob called my attention to the clause which read if he was then in our employ. I said Bob, do you—. He says I think he will make good.

"Q. Was there any talk about the corporation's right to discharge him or terminate the employment? A. Yes, sir. * * * He told me the directors always had the right to discharge. He was so sure his son would make good and I hoped so."

In August 1955, Mrs. Ireland was a widow 77 years of age without any lineal descendants. She was possessed of an estate which exceeded $800,000 in value. Included in this estate were 9,059 shares of the voting common stock of Ireland's Lumber Yard. R. J. Charlesworth, whose age is not shown by the record, was President and General Manager of Ireland's Lumber Yard. He owned 2,100 shares of the corporation's voting stock. He had been closely associated in business with Guy Ireland, the deceased husband of the plaintiff, for 40 years, and ever since Guy Ireland's death had been plaintiff's principal advisor, not only with respect to Ireland's but in relation to matters of investment and other business transactions. It is evident too that a strong bond of friendship existed between the Ireland and Charlesworth families. Both R. J. Charlesworth and Mrs. Ireland wanted William Charlesworth to enter the business of the corporation and eventually succeed to its management. To persuade him to resign his commission as a Lt. Colonel in the Air Force and surrender his 13 years

seniority and accumulated rights it was necessary to offer a substantial consideration. Accordingly, the agreement for an option to purchase voting stock in the corporation was made.

No doubt, at the time the contract was made, the parties anticipated that R. J. Charlesworth would live long enough for his son to acquire the experience and knowledge necessary to take over the management of the business when R. J. Charlesworth relinquished it. However, R. J. Charlesworth might have died suddenly within a month after the contract was made and there is nothing in the contract which would require William to be ready to take over the management immediately upon the death of his father. His training could well have continued under the tutelage of another manager. The parties clearly contemplated that William should have the opportunity to gain the necessary experience.

■■■ The contract cannot be construed as an agreement on the part of the plaintiff to use her power as the majority stockholder to give William Charlesworth a permanent job with the corporation, without regard to the welfare of the corporation or its other stockholders. Plaintiff's own testimony prohibits such a construction. The contract therefore is not void as against public policy. It does not follow, however, from the fact that plaintiff did not guarantee employment for the defendant indefinitely that she had the right to use her power as a majority stockholder to terminate his employment arbitrarily for the purpose of voiding her obligations under the contract. "Each party to a contract impliedly agrees not to prevent the other party from performing or to render performance impossible by any act of his own." 17 C.J.S. Contracts § 468, p. 967; Bomberger v. McKelvey, Cal.App., 205 P.2d 709; 35 Cal.2d 607, 220 P.2d 729; Miller v. O. B. McClintock Co., 210 Minn. 152, 297 N.W. 724; In re Skade's Estate, 135 Neb. 712, 283 N.W. 851; Dilworth v. Brown & Bigelow, 128 Pa.Super. 124, 193 A. 125; Mawson-

Peterson Lumber Co. v. Sprinkle, 59 Wyo. 334, 140 P. 588, 147 A.L.R. 1089; Burke v. N. P. Clough, Inc., 116 Vt. 448, 78 A.2d 483; Douchkess v. Campbell, Sup., 64 N.Y. S.2d 554, affirmed 272 App.Div. 795, 71 N.Y.S.2d 925, appeal denied 272 App.Div. 961, 72 N.Y.S.2d 830.

■■■ In Douchkess v. Campbell, supra, it was said:

"The agreement by Campbell that during the five year period he would pay over to plaintiff a one-fifth share of all benefits received on his holdings of Standard's stock, and would give plaintiff an option to purchase from him up to 14% of Standard's outstanding stock, was coupled with the condition precedent that plaintiff continue to act as Vice President and Comptroller of Standard; a position to which he was elected on the same date as the agreement was signed, as shown by the minutes. If plaintiff was prevented from fulfilling this condition by Campbell's act in having him discharged, his remedy is to sue for breach of Campbell's promises and allege such act of the promissor as the excuse for his non-performance of the condition precedent. Matter of Casualty Co. of American (Bliss Co. claim) 250 N.Y. 410, 419, 165 N.E. 829, 832, 833; Amies v. Wesnofske, 255 N.Y. 156, 162, 163, 174 N.E. 436, 437, 438, 73 A.L.R. 918. 'The doctrine is purely one of waiver; active conduct of the conditional promisor, preventing or hindering the fulfillment of the condition, eliminates it and makes the promise absolute.' Amies v. Wesnofske, supra." [64 N.Y.S.2d 559.]

What we have said so far disposes of the plaintiff's contention that the contract cannot be enforced as a matter of law because it is either contrary to public policy and therefore void or because defendant has failed to continue to comply with a condition precedent to enforcement.

Plaintiff has also challenged the contract on other grounds. She argues that the agreement is unenforceable because of indefiniteness, uncertainty, lack of mutuality and failure of consideration. She asserts that the agreement is unconscionable and that her consent thereto was obtained by the abuse of a confidential relationship.

On defendant's part the contract required him to resign from the Air Force, to take employment with Ireland's Lumber Yard and to continue in that employment in order that he might acquire the experience and knowledge which eventually would fit him to assume the office of general manager. On plaintiff's part, in consideration of performance by the defendant, it required that she keep in force a provision of her will giving the defendant an option to buy from her estate enough voting stock in the corporation to give him control. By legal implication the contract also required that she refrain from exercising her power as majority stockholder arbitrarily or unfairly to prevent defendant from performing his obligations under the contract. If defendant breached the contract by voluntarily leaving the employ of Ireland's, he would surrender the entire consideration which he was to receive for a completed performance.

 As we see it, this contract is neither indefinite or uncertain. It is true that it does not specify the capacity in which the defendant should be employed or what his pay should be, as is pointed out by the plaintiff. However, it was clearly understood between the parties that the employment should be in a capacity which would eventually qualify the defendant for managership, if he had the ability, and that his pay should be what his services were worth. We are also satisfied that the contract is not lacking in mutuality. " * * * Mutuality of contract generally consists in the obligation on each party to do, or to permit something to be done, in consideration of the act or promise of the other .* * *." 17 C.J.S. Contracts § 100, p. 443. To say

that a contract must have mutuality is but another way of stating that there must be a valid consideration. Williston on Contracts Rev.Ed. Sec. 141. It is entirely different from mutuality of remedy, lack of which ordinarily does not affect the validity of a contract, but may prevent its enforcement by specific performance. Williston on Contracts Rev.Ed. Sec. 1431. The contract, here under consideration, imposes upon each party obligations which each has promised to perform in consideration of performance by the other. It therefore meets the requirements of mutuality. Much has been said in this connection concerning R. J. Charlesworth's statement that William could leave the employ of the corporation if he chose to do so. Upon the basis of this statement it is argued that there was no obligation on William to remain in the corporation's employ. We think it a sufficient answer to this argument to point out, that if William did voluntarily leave the employ of the corporation, he would surrender all of the consideration which he was to receive under the contract. Contracts which include inducements for continuing employment are very common. Some offer increased pay scales at the end of stated periods, others offer bonuses, but constitutionally it is impossible to compel the employee to remain in the employment until he has earned what has been offered as an inducement to remain. Such contracts are not lacking in mutuality. The issue as to failure of consideration, due to the fact that defendant was discharged by the corporation, has already been considered under another heading wherein we pointed out that defendant's performance of this condition would be excused if performance was prevented by the plaintiff.

 Plaintiff's claim that the contract is unconscionable and unfair is based principally upon the provision of the contract which permits the defendant to pay for the stock in 20 equal annual installments without interest. She states that this provision is inequitable and that the unfairness of the contract coupled with the fact that a con-

fidential relationship existed between the plaintiff and R. J. Charlesworth, at the time the contract was executed, makes the contract voidable in equity. In considering the rule applicable to contracts, where a confidential relationship exists between the contracting parties this court stated:

> "It is, of course, well settled that courts of equity will carefully scrutinize transactions between persons occupying relations of trust and confidence, and will not hesitate to reach out their strong arm in protection of the weaker against the stronger mind, where an inequitable or unconscionable bargain has been obtained through improper or undue influence; but it is equally well settled that the influence, in order to vitiate the contract, must amount to force or coercion so as to destroy free agency." Fjone v. Fjone, 16 N.D. 100, 103, 112 N.W. 70, 71.

In our examination of the contract to determine whether it is unfair our first concern is whether there was a reasonable equality of consideration received or surrendered by the parties. A good consideration includes:

> "Any benefit conferred or agreed to be conferred upon the promissor by any other person to which the promissor is not entitled lawfully, or any prejudice suffered by such person, other than such as he, at the time of his consent, is lawfully bound to suffer as an inducement to the promissor is a good consideration for a promise." Sec. 9-0501, NDRC 1943.

In this case the plaintiff promised that upon her death the defendant should have an option to buy enough voting stock of Ireland's Lumber Yard to give him voting control. The price of the stock was to be the book value thereof and the stock could be paid for in 20 equal annual installments without interest. There were 12,500 voting shares of Ireland's common stock. The Charlesworths owned 2,370 of such vot-

ing shares. A majority of the voting shares was 6,251 shares. The contract therefore required Mrs. Ireland to retain 3,881 of her 9,054 shares for sale to the defendant. The present book value of these shares is about $25 a share. 3,881 shares would have a value of $97,025. This amount would have to be paid by the defendant in 20 annual installments of $4,851.25. The present value of 20 annual payments of $4,851.25 each, with interest computed at 5%, is $60,457.30. Computed upon a strictly business basis it may be said therefore that the contract required Mrs. Ireland to sell her stock to the defendant for approximately $36,600 less than it was worth, if that worth is computed on present book value of the stock. In return for this privilege defendant gave up his commission in the United States Air Force. At that time he was 35 years of age. After seven more years of service he would have been entitled to a minimum retirement income for life of $326 a month. If he were promoted during the last seven years of service his retirement income would be a larger amount. At age 35 defendant's life expectancy was 33.44 years according to the Commissioner's Standard Experience Tables of Mortality (1941). Defendant in leaving the service therefore surrendered the prospect of a retirement income of $326 a month or more for a period of 26.44 years. The present value of such an annuity with 5% interest at the time it first accrued would be approximately $57,166. Defendant's income with the Air Force was $10,246 a year. It would increase with promotions and each additional 3 years of service. His salary at Ireland's in 1956 was $12,400 a year including his bonus.

It appears therefore that as a result of accepting the proposal of the plaintiff and R. J. Charlesworth, defendant surrendered the prospect of a life annuity which would have had a present value over $57,000, a salary of at least $10,246 a year and other benefits such as free medical and dental care and income tax exemptions and received in exchange an option to purchase

stock of Ireland's for approximately $36,-000 less than it was worth, and a salary of $12,400 a year.

 From these facts it appears that the detriment suffered by the defendant as a result of the agreement was at least the equivalent of the benefit received. Certainly, there is no such excess of benefits, that it would raise an inference that the contract was unfairly entered into through the abuse of a confidential relationship.

 Since, however, the value of the detriment suffered by the defendant, as a part of his consideration for the contract, did not pass to the plaintiff we shall consider what evidence there is upon the contention that there was an abuse of a confidential relationship on the part of R. J. Charlesworth which amounted to undue influence.

The only evidence with respect to the negotiations for the contract and the nature of the relationship between the parties is that of the plaintiff. From that testimony it is clear that the plaintiff had confidence in the ability and integrity of R. J. Charlesworth. She allowed him a completely free hand to conduct all of the business affairs of Ireland's Lumber Yard and consulted him in connection with proposed investments. Of course, operating the lumber yard was the job Charlesworth was hired to do and she knew that he had much more experience in that field than she had. She also would consider that the advice of a man who had 40 years or more of active business experience would be valuable in connection with investments and other business transactions. On the other hand she occupied a position of financial dominance over Charlesworth. As a majority stockholder of the corporation she had the power to elect directors who could discharge Charlesworth at any time. It is not every confidential relationship which gives rise to a presumption of undue influence. As was said in Doheny v. Lacy, 168 N.Y. 213, 61 N.E. 255, 258, "The law will not pre-

sume it from the ordinary relations between persons in the business world or in the family connection. The question as to parties so situated is a question of fact dependent upon the circumstances in each case." In Cowee v. Cornell, 75 N.Y. 91–101, it was said:

"Most of the business relations between persons, in a sense and to a degree, rest upon confidence reposed by the one in the other. Without it, the commercial dealings of the community would be seriously restricted. But the common-law presumption of impropriety or unfairness was not intended to reach such cases, or any cases except those where the circumstances have created what the law regards as a fiduciary relation, and where as a safer general assumption, it regards one as the stronger party, and therefore as bound, in every transaction with the other, to establish affirmatively its good faith and propriety. There was nothing in the relations sustained by the defendant to Gleason which of themselves created any presumption of undue influence or undue advantage taken. Whether as president and cashier of their bank, as employer and employee, as capitalist and business manager, or as uncle and nephew, their relations gave rise to no presumption of inequality in their dealings. Their association was extraordinarily intimate, it may be conceded; but any question about their relations is one of fact, and must be determined upon satisfactory extrinsic evidence. I think that there was no error committed by the trial judge in holding that the affirmative upon the issue remained with the plaintiffs." See also Williston on Contracts Rev.Ed. Sec. 1625A, Note 2 and cases cited.

 Section 497, Rest. Contracts, states the rule as follows:

"Where one party is under the domination of another, or by virtue of the

relation between them is justified in assuming that the other party will not act in a manner inconsistent with his welfare, a transaction, is induced by undue influence and is voidable."

Comment c. to this section reads:

"The degree of persuasion that is unfair depends on a variety of circumstances. The ultimate question is not merely whether the persuasion induced the transaction, for such persuasion is often permissible, but whether the result was produced on the one hand by influencing a freely exercised and competent judgment or on the other by dominating the mind or emotions. The weakness or dependence of the person persuaded is a strong circumstance tending to show the persuasion may have been unfair."

 Because the relationship between the plaintiff and R. J. Charlesworth was not such as to give rise to a presumption of an abuse of a confidential relationship, we are of the opinion that the burden was on the plaintiff to establish that she was unfairly persuaded and that her consent to the agreement was not given as the result of a freely exercised competent judgment.

 At the time of the execution of the first letter agreement, Mrs. Ireland was 77 years old. R. J. Charlesworth was younger but his age is not shown by the record. Advanced age does not, however, raise a presumption of mental weakness or incapacity. 17 C.J.S. Contracts § 133, p. 481. There is not a single word of testimony in the record or any claim by the plaintiff that she was not mentally alert and strong or that she was incapable of understanding or making intelligent decisions. Her testimony in this record indicates that she was mentally alert two and one half years after making the first agreement. The record shows that sometime in the spring of 1955 the plaintiff advised R. J. Charlesworth that she intended to sell Ireland's Lumber Yard when he retired.

As an alternative to a sale which in his opinion would entail a considerable sacrifice, he suggested that a young man be employed and trained to take over the management of the business. He named his son, William, as a proper person for the job. Mrs. Ireland stated: "I thought it was a fine idea." It was then agreed that R. J. Charlesworth should negotiate with William to see if it was possible to get him to resign from the Air Force and take the job. Sometime during the summer of 1955 R. J. Charlesworth and Mrs. Ireland agreed upon the letter contract and codicil which would be offered to William Charlesworth as an inducement to leave the Air Force and associate with Ireland's. They discussed it many times. In July 1955, before the agreement was executed, she personally urged William to make the change. After William had left Grand Forks at the end of his 1955 vacation, she asked R. J. Charlesworth more than once if Bill was coming and when was Bill coming. She employed and paid the lawyer to draw the contract and codicil. After receiving copies of the instruments from her lawyer, she took them to R. J. Charlesworth and discussed them in detail. Referring to that conference she said that R. J. had confidence that Bill would make good and "I certainly hoped so." Later she went to her lawyer's office and in the absence of R. J. Charlesworth executed both the codicil and the contract. Further after having a year and a half to consider what she had done, she executed a second letter and codicil giving the defendant the same stock option. There is nothing in her testimony to suggest any unfair persuasion or that her agreement was not the result of the exercise of a free and competent judgment. In view of the fact that she had no lineal descendants to take over the business and that she had an estate of over $800,000, the circumstance that she gave William Charlesworth an option to buy stock on favorable terms for the purpose of keeping the management of the lumber yard in the control of a family which had been closely associated with the corporation for over

40 years does not create a presumption of undue influence. "The line between due and undue influence, when drawn, must be with full recognition of the liberties due every true owner to obey the voice of justice, the dictates of friendship, of gratitude and benevolence as well as the claims of kindred." Wallace v. Harris, 32 Mich. 380.

■ Although Mrs. Ireland has now changed her mind after consulting with some of her heirs, we are satisfied that she not only freely consented to the contract in 1955, but that she acted independently of R. J. Charlesworth to persuade William to accept it. We therefore hold that the contract is not voidable on the ground of undue influence.

The judgment of the district court must therefore be reversed and the case remanded to the district court for a jury trial of the counterclaim upon the issues of whether the discharge of the defendant by the corporation was procured by the plaintiff arbitrarily or for the purpose of attempting to evade her obligations under the contract and, if so, the amount of damages.

SATHRE, C. J., and MORRIS, J., concur.