Dukpee, -Judge,
delivered the opinion of the court:
This is an action to recover damages for breach of contract. Plaintiff agreed to manufacture cartridge cases for defendant, and defendant agreed to furnish plaintiff with certain machines necessary for this manufacturing. Plaintiff claims that the machines so supplied by defendant were unfit for the purpose intended, thus causing plaintiff delay and extra expense.
Ekco Products produces metal housewares and engages in considerable defense work for the United States Government. During World War II and the Korean War, Ekco made various sizes of cartridge cases for defendant. A *77 cartridge case is that portion of an artillery shell which holds the explosive charge and firing device. The projectile is fitted into the open end of the case. Each manufacturing project carried out by plaintiff for defendant is usually governed by two contracts, a supply contract and a facilities contract. The supply contract contains the agreement by plaintiff to manufacture a certain item. The facilities contract is an agreement by defendant to supply plaintff with machinery necessary to make the item. A single facilities contract may be amended to provide machinery for subsequent supply contracts, as was the case in this litigation.
In October 1954 the Navy Department requested plaintiff to submit a proposal for the production of one million 40 mm. cartridge cases. Plaintiff made an offer to manufacture these cases and stated that it would require additional machinery for the job. Plaintiff proposed that Facilities Contract NOrd (F) 1486, already in force between plaintiff and defendant, be amended to provide for the procurement and installation of five New Britain Head Turning Machines and an Ajax Electric Heat Treating Furnace as well as other facilities. In the event defendant wished to furnish this machinery from Government reserve, plaintiff stated that it would demand the opportunity of prior inspection and acceptance, and the necessary funds to rehabilitate and install these facilities. Shortly after receiving this offer, Navy officials advised plaintiff that the additional machinery would be supplied from Government reserve.
In November 1954, Mr. Didriksen, plaintiff’s comptroller, and Mr. James E. Carroll, Ekco’s employee in charge of the 40 mm. project, visited the Bureau of Ordnance in Washington, D.C. to determine what machinery was available in Government storage suitable for the proposed contract. They conferred with Mr. John W. Nelson, Chief of the Machine Tools and Production Equipment Section. This section maintained records on each piece of machinery the Navy owned, classifying them according to type, condition, location, etc. During this initial conference plaintiff was advised that the Government would make available for plaintiff’s use the requested facilities, including one new Ajax Electric Heat Treating Furnace, located in Detroit, *78 and five New Britain Head Turning Machines, classified as in 0-2 condition on the records kept in Mr. Nelson’s office.
On December 16, 1954, plaintiff submitted a second offer to the Navy Department revising the total cost downward. As to the additional equipment to be put at plaintiff’s disposal, this revised offer stated:
We also request the right to inspect and accept these additional Schedule B facilities prior to shipment to our plant and we have been informed that the Government owned equipment is in workable order for this manufacture.
On January 13, 1955, plaintiff was awarded the contract on the basis of its revised offer. Supply Contract NOrd 15,579 was thereupon executed under which plaintiff agreed to manufacture the cartridge cases at the unit price of $1,446. On January 25, 1955, Amendment No. 8 was added to Facilities Contract NOrd (F) 1486 to provide that defendant would furnish the additional machinery needed to make the 40 mm. cases. Defendant also agreed to bear the costs of installation and rehabilitation of the facilities given under this amendment; the estimated cost of rehabilitation was ■stated at $10,250.00.
The original plan under the contracts called for the first delivery of cartridge cases in June 1955 and the final delivery five months later, in October 1955. Production did not begin, however, until September 1955 and it was not •completed until June 1956, ten months later. Plaintiff alleges that this delay, and its resulting expenses, were caused by the failure of the Ajax Electric Heat Treating Furnace and the New Britain Head Turning Machines to do the job that they were intended to do. More precisely, plaintiff charges defendant with a breach of a warranty of fitness on •each of these machines.
Whether or not any such- warranty existed in respect of the Heat Treating Furnace we need not determine. There is sufficient evidence that plaintiff’s difficulties with this facility were largely its own doing.
Shortly after Amendment No. 8 to the facilities contract was made on January 25,1955, plaintiff’s employees made an inspection of the furnace in Detroit. They determined that *79 parts of this'apparatus were missing and that they would-be required under plaintiff’s production plans. Plaintiff was under the impression that' all 'the components of the furnace it would need were in Detroit and included within Amendment No. 8. Plaintiff notified defendant on February 10, 1955 of its understanding in this regard and requested defendant to supply the additional equipment necessary. On April 14, 1955 defendant executed Amendment No. 9 to the facilities contract, NOrd (F) 1486, authorizing Ekco to acquire and install at defendant’s expense, every item plaintiff requested in its letter of February 10. In the meantime, all the furnace parts in Detroit were shipped to Ekco’s plant in Chicago, Illinois.
Ekco’s order to Ajax for the additional furnace parts was dated May 18. Plaintiff argues that there is no evidence that this one-month period between the Navy’s authorization and Ekco’s purchase was unduly long. On the other hand, there is no evidence to the contrary. Plaintiff knew what it wanted on February 10th. It received authorization to purchase at the Navy’s expense on April 14th. Plaintiff should have presented some evidence as to why it waited until May 18th to order the parts. It did not do so.
There is a conflict between the parties as to when the furnace sections ordered from Ajax were delivered to Ekco. The parts arrived either on an early September date or on September 29th, or possibly on both dates. The Ajax furnace was a novelty to plaintiff’s personnel; they had had no previous experience with the contraption. Outside assistance for the assembly and installation of the furnace was procured some time in October. There is, consequently, evidence that Ekco delayed nearly two months in obtaining such outside help after the delivery of the parts from Aj ax. The assembly :and installation of the furnace were not completed until .January 9, 1956, almost nine months after defendant authorized the additional parts.
It is our conclusion that lack of experience and undue ■delay contributed to plaintiff’s losses, if any, in this regard. Defendant is not to be charged with these shortcomings. Once the furnace was installed it performed its functions properly; at least we have not been informed otherwise.
*80 Ekco’s problems with the Head Turning Machines were of a different nature and more serious. As we have noted, plaintiff’s representatives, Mr. Didriksen and Mr. Carroll, visited the Navy Bureau of Ordnance in Washington, D.C., in November 1954 to discuss the contract and to determine what machinery the Navy would make available to Ekco. At that time, Mr. Nelson, Chief of the Machine Tools and Production Equipment Section, informed plaintiff that defendant could supply Ekco with five New Britain Head Turning Machines, all in 0-2 condition. Mr. Nelson explained that his office has a file card on each machine tool owned by the Navy, and that besides the other information recorded thereon, the condition of the machine is noted by the use of code symbols. The symbol N-l describes a new machine in perfect condition; ft-4 describes a machine hi poor condition needing major repairs. A machine in 0-2 condition is “used property, more worn than 0-1 but still in good condition with considerable use left before any important repairs would be required.” Other than explaining the meaning of the code, Mr. Nelson made no repi’esentations as to the condition of the Head Turners. He had no other knowledge as to their condition except that which wras given to him by the symbols on the file cards.
It was after this meeting with Mr. Nelson that plaintiff submitted its second offer to the Navy on December 16,1954, and again requested the right to inspect and accept the facilities to be furnished by defendant. And as we have noted, plaintiff stated in its second offer that it has “been informed that the Government-owned equipment is in workable order for this manufacture.” The contracts were executed in January 1955, plaintiff agreeing to produce the cartridge cases, and defendant agreeing to supply the Head Turning Machines plaintiff needed at its plant.
We must decide whether the arrangements thus agreed upon between the parties imposed a warranty obligation on defendant as to the condition of the machines. Was there a warranty of fitness for use on the facilities? There is no express warranty stated in the contracts between the parties. Nor is there any disclaimer of warranty in either contract. If a warranty existed, then, it must be implied. If the *81 warranty is unavailable to plaintiff in this litigation, it must be because of subsequent actions of the parties, not because of anything stated in writing in the supply and facilities agreements.
Defendants owned and kept title to the Head Turning Machines during the entire period of production. Use and possession of the facilities, however, were given to plaintiff. The bailor-bailee relationship thus created was for the benefit of both parties. Defendant was able to induce plaintiff to accept the contract obligations and manufacture the cartridge cases; plaintiff expected to receive its profit upon successful completion of the contract. The law applicable to this situation is clear. Where there is a bailment for the mutual benefit of the parties, there is imposed on the bailor, in the absence of a special contract or representation, an obligation that the thing or property bailed for use shall be reasonably fit for the purposes, or capable of the use known or intended.[1] There is no question in this case but that plaintiff needed these machines to manufacture the cartridge cases, and that defendant gave the machines to plaintiff expressly for this purpose. Whether the 0-2 symbol created a warranty is unimportant to decide; the arrangement itself between the parties gave rise to the warranty on the machines. The conversation pertaining to the file cards in Mr. Nelson’s office simply demonstrates more clearly that plaintiff and defendant had the proposed use for these machines fixed in mind.
Given the warranty, defendant asserts that it is inoperative because plaintiff never intended to rely on it, or because plaintiff, by its conduct, forfeited its rights under the guarantee.
Plaintiff reserved the right to inspect and accept the Head Turners before installation. But by inspection plaintiff w-as able to determine very little, if anything. The machines were covered with cosmoline, a protective grease, which could not be conveniently removed until the machines were delivered to Ekco. From the evidence it is clear that it was almost impossible to determine whether the machines would *82 do their job properly until they were actually installed in the production line and put into operation. Mr. Karzel, Ekco’s engineer, reported from his inspection that the Head Turners were “in fair condition” and that after cleaning, they “should be checked for wear and repaired where necessary.” Mr. Nelson stated that the machines were in good condition, needing no “important repairs.” These statements do not conflict. Mr. Nelson interpreted the 0-2 symbol to mean that the machines would do the job without major repairs. Mr. Karzel didn’t discover or report differently.. Under the circumstances, we are constrained to hold that the right of inspection and acceptance exercised by plaintiff did. not defeat the warranty of fitness.[2]
Defendant argues that Ekco did not demand better machines during the negotiations or the actual production of the cartridge cases. The fact is, better machines were not available. Plaintiff was only gaining use of the Head Turners; it was not purchasing them. The Navy was to pay for their installation and repair. Under these circumstances, we can only assume that plaintiff would have requested and received better facilities if the Navy had had them. The Government’s witness, Mr. Nelson, testified that 0-2 was the best he could supply plaintiff. There is no evidence to the contrary.
The 0-2 condition itself does not detract from the warranty of fitness because, as Mr. Nelson explained, 0-2 means, that the machines are-.in good condition and need no important repairs. This must mean, at least, that they can do the work for which they were built. The $10,250 estimated for rehabilitation was provided by defendant to repair all of the machines included within Amendment 8 to the Facilities. Contract. Defendant estimates the value of these twenty machines, including the Heat Treating Furnace and the Head Turning Machines, to be over $1,000,000. Obviously, the-parties envisioned no more than minor repairs on these machine tools. The $10,250 set aside for repairs, then, cannot, affect the warranty.
There seems to be little dispute that if a warranty existed, the Head Turning Machines failed to live up to the expected *83 performance. There is abundant evidence that the machines broke down continually during the first four months of use. The more important issues raised by defendant deal with Ekco’s failure or inability to correct the trouble, and its failure to notify defendant of the difficulties. Defendant asserts that these factors dispel the effect of the warranty guarantee.
Ekco was unable to determine if the Head Turners would operate properly until production actually commenced in September 1955. When the first few runs were made, Ekco then realized that the machines were not ready for full duty. Ekco found itself in this perplexing situation. It did not know the extent of further repairs necessary, nor how long they would take. There were no other machines in better than 0-2 condition available to replace the ones it had installed, and if there were, Ekco did not know how long it would take to make the change. For all Ekco knew, the Head Turners might be repaired in just a few days which would end all the trouble, and be far more efficient than trying to replace the Head Turners. And every machine failure throughout the process presented plaintiff with the same situation. It was never apparent at any time that the machines were wholly useless. It was not unlikely that the very next bit of repairing might put the machines into full working capacity. The fact is that by the middle of January 1956, three of the Plead Turners were able to function well enough to put the manufacturing process back in proper order.
The argument that Ekco should have notified defendant of the trouble, and thereby given the Government an opportunity to alleviate the situation, simply ignores the weight of evidence presented in this litigation. Mr. Nelson and other Navy representatives knew perfectly well that Ekco was having production difficulties and problems with the Head Turners during these first four months, and yet the Navy prodded Ekco along to complete the work. We are not convinced that the Navy could have done anything to save plaintiff’s losses anyhow. Defendant had no machines in better condition to offer plaintiff and the evidence discloses that Ekco acted as quickly and reasonably as it could to put the *84 Head Turners into working condition. Mr. Haas from the New Britain Machine Company, which manufactured the Head Turners, was consulted and his services utilized. Ekco also sought out the Clayton-Lambert Company in Kentucky, the only other manufacturer using these Head Turners, to gain what help it might from that source. We have no evidence that plaintiff’s employees themselves were lax or inept in their efforts to solve the problems.
Defendant’s argument that Ekco should have requested replacements or that it waived its rights under the warranty by its decision to keep the machines, rather than return them as useless, is of no merit under these circumstances. Plaintiff cannot be held to have waived its rights under this warranty by its efforts to repair the machines and complete the contract for defendant. Ekco followed what it reasonably considered to be the most efficient course of conduct to pursue.[3]
Defendant’s purported counterclaim, brought up for the first time in its brief to this court, must necessarily fall under the weight of this holding. Defendant asserted that it is entitled to recover damages for plaintiff’s failure to properly repair the machines.
Defendant’s argument that plaintiff failed to pursue its administrative remedies is likewise without merit. This is a claim for unliquidated damages over which, as defendant admits, “the Contracting Officer has no jurisdiction.” [4]
We find from all of the evidence that the failure of the Head Turners to perform properly was the central cause of plaintiff’s delay and extra expense. This question is not free from doubt as there is some mention in the record of other delaying factors. But there is no dispute over the fact that after the Head Turners were working satisfactorily, production proceeded to completion without further obstruction.
Plaintiff’s recovery in this suit is not subject to Renegotiation. By a letter of March 6, 1958, from the Renegotiation Board to Ekco Products Company, defendant agreed that any recovery gained from this proceeding would remain unaffected by Renegotiation.
*85 Plaintiff established damages in the amount of $288,582.05, and judgment is entered for it in that amount.
Davis, Judge; Laramore, Judge; Whitaker, Judge; and JONES, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Lloyd Fletcher, and the briefs and argument of counsel, makes findings of fact as follows:
introductory
1. Plaintiff, Ekco Products Company, is an Illinois corporation whose principal business is the manufacture of metal housewares, baking pans, and related hardware. Also, during World War II and the Korean war, Ekco engaged extensively in the manufacture for the Government of cartridge cases in varying sizes.[5] It has brought this suit to recover damages and loss of anticipated profit arising out of alleged breach of warranties by defendant as to the condition and availability of certain manufacturing equipment furnished by the defendant for Ekco’s use in the manufacture of 40 mm. cartridge cases under the Navy contracts referred to below. The items of equipment complained of were New Britain No. 656 Head Turning Machines and an Ajax Electric Heat Treating Furnace which will be described in detail hereinafter.
THE CONTRACTUAL ARRANGEMENTS BETWEEN THE PARTIES

A. Preliminary negotiations

2. On October 25, 1954, the Bureau of Ordnance in the Department of the Navy wired Ekco requesting the submission of a proposal, including price breakdown, for the production of one million 40 mm. cartridge cases at a rate of 170,000 per month, starting in April 1955. In response to that request, Ekco submitted a proposal by letter dated November 8,1954, for the production of said cartridge cases at a unit price of $1.60. The letter also stated:
*86 This proposal is submitted on the basis of our making use without charge of the Government facilities acquired under Contract NOrd(f) 1486 and installed in our plant at Chicago, Illinois. To accomplish the production of these 40 mm. cases certain additional facilities will be required, and they are detailed in a schedule attached hereto.
Among the additional facilities required were 5 New Britain Head Turning Machines estimated to cost $175,000 and an Ajax Electric Heat Treating Furnace to cost $192,000.
After proposing a delivery schedule, an estimated lead time of 6 months for acquiring and installing additional facilities, and a profit allowance of 10 percent of cost, the letter continued:
With respect to the additional facilities requested, we are agreeable and willing to accept similar facilities which may be available in Government reserve provided we are given the opportunity of prior inspection and acceptance. In the event any Government facilities are so accepted by us, we shall require funds, where necessary, for rehabilitation and installation.
A few days after the mailing of this proposal, Ekco’s Treasurer and Comptroller, Mr. J. W. Didriksen, was contacted by Navy officials who advised him that the Navy had insufficient funds to carry out the program in the manner proposed, by Ekco, but suggested that he come to Washington for the purpose of discussing an alternate program, including the use of Government-furnished facilities held in the Government equipment reserve.
3. In November 1954, Mr. Didriksen and Mr. James E. Carroll, who was Ekco’s employee in direct charge of the 40 mm. project, visited the Bureau of Ordnance in .Washington for the purpose of determining what machinery was available in Government storage suitable for the manufacture of 40 mm. cartridge cases. They conferred with Commander O. A. Wesche, then Chief of the Ammunition Procurement Section, and with Mr. John W. Nelson who> was at that time Chief of the Machine Tools and. Production Equipment Section. The latter section maintained a file of property record cards which contained fairly comprehensive information on each Navy-owned machine tool. Among other things, these cards contained a description of the type *87 of equipment, its location,.and its condition. The condition of the equipment was described by code symbols ranging all the way from N-l,. meaning “new or unused property in excellent condition,” to R-4, meaning “used property, in poor condition and requiring major repairs.” An intermediate code symbol used by the Navy to describe the condition of its equipment was 0-2. - This code meant that the property described on the card was “used property, more worn than 0-1 but still in good condition with considerable use left before any important repairs would be required.”
Mr. Nelson showed Messrs. Didriksen and Carroll a number of property record cards covering New Britain Head Turners of varying types, including Model 656. Some of these cards contained the aforesaid condition code 0-2, and Nelson explained to the Ekco representatives that this meant the machines described thereon were in good running condition and usable without any repairs. He had no personal •knowledge as to the actual condition of any of the machines, and other than explaining tire meaning of the code, he made no representations as to their condition.
Thereupon, Ekco sought the advice of the New Britain Machine Co. as to which of its several models of head turners would be most suitable for production of 40 mm. cartridge cases, and that company advised Ekco that only its Model 656 should be used for such production.
Also, during these initial conferences with respect to Navy equipment, Ekco’s representatives were advised by Commander Wesche and Mr. Nelson that the Navy owned and would make available to Ekco a new Ajax Electric Heat Treating Furnace which had not even been uncrated and which was located in Detroit, Michigan, at the plant of Kelsey-Hayes Company.
4. As a result of the foregoing investigation and information, Ekco’s representatives believed that there was available to Ekco suitable and usable Government equipment which, when added to existing plant facilities, would enable Ekco to establish an efficient, continuous and integrated production line for the manufacture of 40 mm.' cartridge cases. Accordingly, Ekco submitted a second proposal to the Navy by letter dated December 8,1954, which proposal was slightly *88 revised by letter dated December 16, 1954. This revised proposal reduced Ekco’s bid for the manufacture of the cartridge cases to a unit price of $1.46, and each letter contained the following statement:
Attached hereto is a schedule setting forth additional Government facilities to be furnished by the Navy Department from its equipment reserves and delivered to our plant in Chicago without cost to the contractor. This proposal is subject to the availability and receipt of the equipment in our plant in sufficient time to meet the aforementioned production schedule.
We also request the right to inspect and accept these additional Schedule B facilities prior to shipment to our plant and we have been informed that the Government owned equipment is in workable order foi this manufacture.
The Government equipment to be furnished, as listed on the said schedule, included 5 New Britain Head Turning Machines, an Ajax Electric Heat Treating Furnace (with refrigeration units), and a Tocco Annealing Furnace.

B. Contract NOrd 15,579

5. By telegram dated January 13, 1955, the Bureau of Ordnance awarded Contract NOrd 15,579 to Ekco for the production of 1 million 40 mm. cartridge cases at the unit price of $1,446. Ekco acknowledged receipt of the telegraphic award by its letter dated January 15,1955, in which the following pertinent statements were made:
jjc # sj« sfc ifi H* ‡
We note that we are now authorized to proceed with the performance of the contract upon the terms and conditions mutually agreed upon during negotiations. However, for record purposes, we wish to point out that those negotiations included an agreement by the Navy Department to amend our existing Navy facilities contract NOrd (F) 1486 so as to provide funds and Government-furnished equipment necessary to the performance of the subject contract.
It is our understanding that an amendment to Contract NOrd (F) 1486 is now in preparation by your office covering these items agreed upon, and will be presented to us for execution in the near future.
We are proceeding with all possible speed in the performance of Contract NOrd 15579 on the basis of *89 your telegraphic award, which we accept subject to the following:
1. The receipt and execution of a Definitive Contract NOrd 15579.
2. The receipt and execution of an Amendment to Contract NOrd (F) 1486 embodying the funds and Government-furnished equipment mutually agreed upon during our negotiations.[6]
6. Shortly thereafter, the formal contract was executed by the parties as of January 18,1955. Under the contract plaintiff agreed to furnish and deliver the following supplies and services:
Iteml: One million (1,000,000) 40mm Cartridge Cases, Mark 3, at a unit price of $1,446.
Item 2: Special tooling necessary to supplement Government-owned special tooling in the possession of the Contractor and necessary modification and alteration of special tooling in the possession of the Contractor, all for production of Item 1, at a price to be agreed upon not to exceed' $116,800.00.[7]
The contract provided for a 5-month delivery schedule of June to October 1955, inclusive, at the following rate:
June 1955- 10, 000 units per month.
July 1955- 90, 000 units per month.
August 1955_ 200, 000 units per month.
September 1955_ 350, 000 units per month.
October 1955_ 350, 000 units per month.
It further contained specifications and manufacturing data, provided for a redetermination of contract prices,[8] and for monthly progress reports by the contractor. The contract also contained the standard general provisions and additional general provisions usually found in Government contracts, including the standard disputes clause, and renegotiation clause. It also contained standard special tooling provisions relating to Item 2 quoted above.

*90
0. Contract NOrd (F) 1486

7. On April 14, 1951, Ekco had entered into Facilities Contract NOrd (F) 1486 with the Bureau of Ordnance. Under this Facilities Contract, the Navy had agreed to furnish Ekco'certain Government-owned, machinery and facilities for use by Ekco in the production of 3"/50 cartridge cases under an earlier supply contract (NOrd 11,678) not involved herein. NOrd (F) 1486 contained the following pertinent provisions:

/Scope of Contract:

(a) The Contractor shall with due expedition, after obtaining the approvals required by Article 3 of the General Provisions, by contract with others or otherwise acquire and install the machine tools, equipment, facilities, and appurtenances identified in Appendix A of this Schedule. . . . The. Contractor shall furnish or cause to- be furnished the labor, materials,- tools, machinery, equipment and supplies necessary for the above described work, . . .
(b) It is agreed and understood that the items of equipment and facilities to be acquired and installed hereunder are to be so arranged and installed at the Contractor’s Chicago, Illinois plant and so established in relation to. other facilities owned by orto be provided by the Contractor, as to enable the Contractor to meet the production schedules called for under Contract NOrd-11678 for the production of 3"/50 steel cartridge cases.

Hi Hi Hi

Authorized Use of Facilities (See Article 12(a) (i)) :
For performing Contract NOrd-11678 and other direct negotiated contracts with the Bureau of Ordnance and other agencies of the Department of Defense.
* * Hi Hi ■' • $
ARTICLE 4. CHANGES
v *j£ »{* iji
(e). The Department shall have the fight to fúrhish to the Contractor Government-owned equipment dr fixtures of the same function and purpose as any of the equipment or fixtures listed in'Appendix A of the Schedule;- provided, ■ that .if the Contractor shall thereby be required to cancel any commitment dr purchase .order, the cost of such cancellation as well as the Contractor’s *91 own costs related to any such item shall (subject to the proviso in paragraph (d) above), be allowable elements of cost hereunder. . . . The Government shall not be liable to the Contractor for damages or loss of profit by reason of non-delivery or of any delay in the delivery of any Government-owned items furnished or to be furnished by the Government to the Contractor.
* * * ❖ *
ARTICLE 9.-SUSPENSION AND TERMINATION
* ¡!¡ * * if:
(e) Excusable Delays. The Contractor shall not be charged with any liability for failure or delay in performance when such failure or delay (herein called an Excusable Delay) is due to causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to (1) acts of God or of the public enemy, (2) acts of the Government of the United States or any state or political subdivision thereof,.... If the Contractor shall fail to notify the Contracting Officer in writing of the cause of any such failure or delay within ten (10) days (or such longer period as the Contracting Officer may approve) from the date it appears that such cause will delay completion of this contract beyond the completion date specified in the Schedule, the Contractor shall lose all right to the extension of time for delivery by reason of such cause. Upon request of the Contractor the Contracting Officer shall ascertain the facts and extent of failure or delay, and, if he shall find that the failure or delay was occasioned by any one or more of the said causes, he shall revise the completion date in the Schedule accordingly.
ARTICLE 12. USE, MAINTENANCE AND DISPOSITION
(a) Contractor's Authority to Use. the Facilities
(i) The Contractor is hereby authorized to use the facilities for the performance of (A) the contract or contracts identified in the Schedule and (B) such other contracts or work as may be identified in amendments to the Schedule. The Contractor agrees that it will use the facilities for no other purpose. In the event that the Schedule is amended to identify other contracts or work pursuant to (B), above, the Contracting Officer may prescribe terms and conditions (including rental) with respect to the Contractor’s use of the facilities for such other work, which are different from or additional *92 to those set forth herein or in the Schedule., and such amendments as may be appropriate to set forth any such additional or different terms and conditions shall be made to this contract.
He ❖ * ❖ Hi
(c) Termination of Authority to Use * * *
(ii) The Contractor agrees to notify the Contracting Officer in writing of any item or items of the facilities which at any time are no longer usable or required by the Contractor for the performance of contracts or work for which the Contractor is authorized to use the facilities. Such notice shall be given promptly and in any event not more than 30 days after the Contractor shall have determined that the item or items are no longer usable or needed.
The contract also contained á typical disputes clause. In order to cover the furnishing of additional machinery to Ekco, the contract thereafter was amended seven times, (although not with respect to the above quoted provisions) increasing the total amount of facilities furnished to $1,416,213. Nowhere in the contract is there any specific reference to warranties by the Government, express or implied, as to the condition of equipment furnished thereunder.
8. Amendment No. 8: to Facilities Contract NOrd (F) 1486 was entered into as of January 25, 1955, in order to make provision for the Government to furnish additional facilities to Ekco for use in the production of the 40 mm cartridge cases to be produced under Contract NOrd 15,579 supra. The pertinent provisions of Amendment No. 8 are as follows:

General Intent of This Amendment:

It is the purpose of this amendment (1) to increase the scope of the subject'contract to provide for the modification of certain facilities identified in Part I of Appendix A and the installation and repair of additional Government-owned facilities to be delivered to the Contractor, all as indicated in Part V of Appendix A as amended by this amendment, to enable the Contractor to produce certain 40MM Cartridge Cases for the Bureau of Ordnance; * * *
* . * 3= =S 3=
(c) It is .agreed'and understood that the additional equipment provided to the Contractor as set forth in *93 Part V of Appendix A is to be so arranged and installed at the Contractor’s Chicago, Illinois, Plant and that the modifications of existing equipment called for under said Part V are to be such that the Contractor, by the use of said additional equipment and existing equipment as so modified, together with other existing facilities at said plant (exclusive of special tooling) will be able to produce 40MM Cartridge cases of the types, at the rate and as otherwise contemplated by the Contractor’s proposal to the Bureau of Ordnance dated 16 December 1954; it being further agreed and understood that the modification of existing facilities and installation of additional facilities as called for under Part V of Appendix A shall not impair the existing utility of the facilities at the Contractor’s plant (including those provided under this contract) to produce 3"/50 steel cartridge cases.
Hi H» H* H» Hi
The Contractor agrees that when giving written notice to the Contracting Officer pursuant to the provisions of Article 12(c) (ii), it will mail a copy of such notice to the Navy Regional Accounts Office, Washington 25, D.C., Attention Accounts Receivable and Claims Division.
* * * ❖

8fecial Provisions:

* * ❖ * •
3. For the purpose of facilitating, for administration and planning purposes, analysis of the progress of the work under Part V of Appendix A to the subject contract, the Contractor agrees to submit at the end of each month, beginning with the month of February 1955, a report regarding all work covered by Part V of Appendix A which is not completed, such report to contain the following among other pertinent data:
Hi Hi Hi ❖ Hs •
(f) Any appropriate remarks, including reasons for not having ordered any items not placed on order, reasons for delay in delivery or completion of items beyond dates originally expected and any adverse effect of delays on production.
Contained in Part V-B of Appendix A to Amendment No. 8 is the schedule of equipment to be furnished by. the Gov-, emment, as follows:

*94

Although the parties now disagree as to the extent of the coverage intended by the foregoing provision for installation and rehabilitation costs, defendant’s expert witness," Mr. Nelson, testified that when the Government furnishes a contractor with any used machinery, it is realized that some rehabilitation and some cleaning will be required. However, in furnishing machinery carded as 0-2 condition, he would not expect to incur any costs for major repairs.
MACHINERY ACQUISITION, INSTALLATION, AND PRODUCTION DLPITCULTIES

A. The Ajax Electric Heat Treating Furnace

. 9. A few days following the execution of Amendment 8 to Contract NOrd (F) 1486, supra, Ekco sent its Manufacturing Superintendent and Kesearch Metallurgist to the Kelsey-Hayes plant in Detroit for an inspection of the Ajax Electric Heat Treating Furnace which the Navy had agreed to furnish Ekco. They found there the unassembled parts of a portion of a new heat treating furnace, namely, the heating unit and the quench tank sections. It was Ekco’s understanding, upon which it based its proposal of December 16, 1954, that the Ajax Electric Heat Treating Furnace, to be furnished by the Navy included not only the heating- and quenching sections, but also the tempering and mouth *95 annealing sections, the washing and rinsing sections, and the conveyor. Ekco notified the Navy of this understanding by letter dated February 10,' 1955, and requested' that the Navy authorize and fund the following additional equipé ment:' ' '
330KW Temper Furnace___$24, 650.00
250KW Mouth Afirieal Furnace_ 14, 500.0Ó
Wash Tank__Í_i_ 1,500. 00
Flame Dryer_ . 800. 00
Additional conveyor mechanism including four new trans- . - . fers and increase in hydraulic power unit,, with all con- .. :., trol equipment in prewired cubicles____ 25, 000.00
Additional' fixtures — '_-___, 7, 825. Ó0
Ajax supervision_1__ 725. 00
Total__•___75,000.00
The Navy agreed to Ekco’s request, and on April 14, 1955, Amendment No. 9 to Contract NOrd (F) 1486 was executed. It extended the time for completion of facilities installation to August 31, 1955, and added to Appendix A additional equipment to be acquired and installed by Ekco for the Ajax furnace. The additional equipment so authorized comprised the exact items requested by Ekco in its letter of February 10, 1955, as listed above.[9] Those portions of the furnace which were at the Kelsey-Hayes plant in Detroit,, were shipped by the Navy on March 17, 1955, and received by Ekco- a few days thereafter. Although the Navy authorized Ekco at Navy expense to acquire the remaining portions of the furnace on April 14, 1955, Ekco did not obtain these additional parts until early September. Ekco had no previous experience with a furnace of this type, which was received in a completely unassembled condition, and it obtained an outside contractor for the assembly and instal *96 lation. Ekco delayed nearly two months in obtaining such outside assistance, and it was not until January 9, 1956, that the furnace was completely installed in the production line and ready for operation. Although photographs in evidence show some complexities in this equipment, the record does not satisfactorily demonstrate that a period of nearly nine months should reasonably be required for the acquisition of additional parts, and the assembly and installation of this furnace.[10]
Accordingly, it is concluded that Ekco’s additional expense and other difficulties encountered in the heat treatment portion of its assembly line prior to final installation of the complete Ajax furnace were attributable in significant measure to Ekco’s lack of experience with this type furnace and a failure to obtain more promptly both installation assistance and the additional parts therefor following receipt of the Navy’s authorization in April 1955.

B. The Read Tunera

10. The New Britain Model No. 656 head turner required for production under this contract is a complicated combination of six spindles, lathes, and cutting tools. It fashions the “head” or closed end of the cartridge case to specified dimensions. Each cartridge case must be placed on a rapidly revolving collet, or chuck, to which hydraulic pressure is supplied by an oil pump. The spindle then rotates to five other positions, at each of which a tool moves in and out to cut, trim, or otherwise shape the head of the cartridge easel The machine holds six cartridge cases at a time and the various progressive stages of the head turning operation are performed concurrently on each spindle at each position. When each spindle has completed its cycle of rotations and operations through all six positions and has returned to its original position, the case is removed from the machine and continued through the assembly line for further processing.
11. Shortly after receiving the- award of contract NOrd 15,579, Ekco’s representatives again visited the Bureau of *97 Ordnance in Washington for the purpose of concluding arrangements as to selection and inspection of the equipment to be furnished by the Navy. Mr. Nelson of the Navy again took from his files a number of property cards for No. 656 head turners. From this group five cards were selected, all of which indicated that the head turners described thereon were in 0-2 condition. Mr. Carroll of Ekco selected these particular cards because of his belief, induced by Mr. Nelson’s explanation, that machines in 0-2 condition were usable without any major repairs.[11] The cards indicated that 4 of the head turners were stored at Detroit, Michigan and one at South Charleston, West Virginia. Mr. Carroll made notes of their serial numbers and received authorization from the Navy for Ekco’s representatives to make a physical inspection of the 5 machines.
12. On January 31, 1955, Ekco sent engineer representatives, including Emil Karzel, to Detroit and on February 7 to South Charleston for physical inspection of desired Navy equipment which was held in storage at those points. Mr. Karzel took with him a list of serial numbers of machines, including about 10 head turners. At Detroit he found around 10 to 12 head turners which were processed for long-term storage and covered with a grease preservative known as “cosmoline.” By mere visual observation, Mr. Karzel could tell that a number of these head turners were in very poor condition with missing parts. However, from his visual observation of the external portions of three of the head turners at Detroit, together with an explanation by a Navy representative there of the meaning of Code Condition 0-2, contained on the property card,[12] Mr. Karzel selected these three machines as suitable for use in Ekco’s contemplated 40 mm. production.
With respect to these machines, Mr. Karzel’s written report to Ekco stated as follows:
Machines were purchased in 1943 and have been used up to 1946. They have been prepared for stand-by storage and are in fair condition. After cleaning, machines *98 should be checked for wear and repaired where necessary. No foundation required.
At South Charleston, Mr. Karzel found one 656 head turner which, from visual observation and the property card description of 0-2, he reported to be in “good shape.”
Mr. Karzel’s opinion as to the condition of the selected -machines was based solely upon his visual observation of the exterior of the head turners and the explanations made to -him by Navy representatives as to the meaning of the code symbols on the property cards attached to the machines. There were no facilities available to him in the storage warehouses for removal of the grease preservative, for a breakdown and inspection of the interior parts of the machinery., or an actual trial run thereof. Accordingly, Mr. Karzel’s inspection did not disclose whether or not the head turners .would efficiently produce 40 mm. cartridge cases to the tolerances required.
13. On February 8, 1955, closely following the aforesaid inspection by Mr. Karzel, Ekco requested the Navy to ship to it 4 head turners which it understood were located in -Detroit. At this time Ekco did not request that it be furnished the head turner at South Charleston which Mr. Kar-zel had inspected and reported to be in “good shape”, but upon being advised by the Navy that only 3 head turners were available at Detroit, Ekco requested by letter of March 29,1955, that the head turner at South Charleston be shipped to Ekco as a replacement. The Navy took steps to comply with Ekco’s request, and on April 1, 1955, 3 head turners from Detroit were delivered to Ekco, and on May 4,1955, the head turner from South Charleston was delivered to Ekco.[13] These 4 head turners are the same machines described in the Karzel inspection reports referred to above and were used by Ekco throughout its performance of this contract. Although Ekco was entitled under the contract to be furnished by the Navy with a fifth head turner, it never requested such fifth head turner, apparently because its engineering studies had indicated that 4 such machines would probably be sufficient.
*99 14. When tbe 4 head turners were delivered to Ekco, they had attached to them Navy property cards stating that each machine was in' 0-2 condition. On delivery, a Navy inspector and a representative of Ekco made a physical inspéetion of the head turners, and the inspector reported to the Navy Property Administrator that certain parts were missing from some of the machines. Ekco employees proceeded •to clear away the grease coating from the machines and to install them in the production line. This ■ required about 2 weeks’ time. Prior thereto it would have been impossible to determine definitely whether the head turners would .operate properly and efficiently, since this could not be known until the head turners were cleaned, installed, and operated under full hydraulic pressures with cartridge cases installed 'on the spindles. ' ' • ' •

0. Production Dvfficulties

15. As evidenced by the time extension for facilities installation granted by Amendment 9, supra, on April 14, 1955, the parties'had begun to doubt the ability of Ekco to meet the contract delivery schedule set forth in finding 6. Oh May 22,1955, Ekco wrote the Bureau of Ordnance as follows:
' Under the provisions of Contract NQPJD 15579 production is scheduled for initiation during the month of June, 1955 and completion at the end of October, 1955.
We are certain that you are familiar with certain, details which were incurred at the time of our negotiation of the aforementioned contract, and also ,the unfor-seeable [sic] delays in shipment of required facilities.
We have been using our very best efforts — working six days a week with an enlarged engineering and production group — in order to meet production schedules.
Our efforts will be doubled to meet this goal, although it is becoming apparent to us that the target will not be met.
We will relentlessly work to make up the time lost by the unforseen [sic] delays, and we trust that we can .initiate production during the month of August.
Thereafter, Ekco’s monthly production progress reports to the Navy showed delivery forecasts differing materially from the contract delivery schedule. The Navy made no *100 objection to these changes by Ekco at variance with the contract. Representatives of the Navy did make frequent contact with Ekco personnel in an effort to expedite deliveries of the cartridge cases but took no further action. Mr. Nelson and other Navy representatives were aware that Ekco was experiencing production difficulties with the Navy-furnished 656 head turners (see findings 17-21, infra) and that it was frequently complaining in its monthly progress reports that the machines were “in deplorable condition.” However, at no time during the life of the contract did Ekco demand or request of the Navy that the head turners be replaced either by new machines or ones in workable condition.[14] Neither did Ekco utilize the procedure provided by Article 12(c) (ii) of the contract, supra, by notifying the contracting officer in writing that the head turners were “no longer usable or required.” Ekco interpreted that provision as relating to a return of Government facilities for which it no longer had need, rather than to a return of defective facilities. Ekco did not present to the contracting officer any factual question relating to the condition of the head turners under the procedures provided by the disputes clause in the contract. Ekco did not assert any claim against the Navy based upon an express or implied warranty as to the condition of the head turners until it filed this suit on October 4,1957.
16. Although Ekco had considerable experience in the use of New Britain head turning machines for the manufacture of other size cartridge cases, prior to the present contract it had never produced a 40 mm. cartridge case and had no experience in operating a Model 656 New Britain head turner. Ekco advised the Navy of its lack of experience with the 40 mm. case prior to the award of the contract. The only experienced contractor then manufacturing the 40 mm. cartridge case using 656 head turners was the Clayton-Lambert Company in Louisville, Kentucky. That company and the manufacturer of the head turners, the New Britain Machine Co., were the only sources known to Ekco from which it could obtain information concerning the 656 head turner.
*101 17. On May 23, 1955, Ekco obtained the services of Mr. Arthur S. Haas, the Midwest demonstrator and troubleshooter for New Britain Machine Company, to assist it in rehabilitating the four head turners. Mr. Haas made a total of 7 visits to Ekco’s plant, the last working visit being in January 1956. On the occasion of his first visit in May, Mr. Haas, on the basis of a preliminary examination, recommended that Ekco buy some new parts for the head turners. However, the machines were not running at this time, and Mr. Haas stated that it would not be possible to determine the condition of the head turners until they were actually operated with cartridge cases installed thereon for machining.
Ekco placed an order with New Britain for the new parts recommended by Mr. Haas. Upon receipt of the new parts, which arrived at Ekco’s plant somewhat sporadically, Ekco’s personnel concentrated on rehabilitating only one of the head turners in order that it might produce its test lots for submission to the Navy. By a report to the Navy dated July 27, 1955, Ekco stated “New Britain ready for production.” In August 1955, Ekco produced test lots of the cartridge cases which were submitted to the Navy and approved. Production proceeded slowly during September with only one head turner working satisfactorily. But Ekco’s report to the Navy dated October 14,1955, continued to state “New Britain ready for production.” Although Mr. Haas had visited Ekco’s plant on October 3, Ekco continued to experience difficulty in rehabilitating the other head turners, and Mr. Haas returned on October 26. He also spent 5 days at the plant in November, 1 day in December, and 1 day in January 1956. He himself worked on the head turners in excess of 50 hours. All of his recommendations for new parts and as to operating techniques were closely followed by Ekco with the exception of his recommended operating speeds for the head turners. His recommendations as to operating speeds were abandoned by Ekco due to the circumstances stated in finding 19, infra.
18. The head turners had 2 sets of gears which respectively determined the speed of the “feed” and the speed of the *102 “spindles”: • The setting of these gears determined mechanical or theoretical gross capacity of the machines.. -The New Britain' Machine' Company had- recommended to Ekco gear •settings that would give an individual machine capacity of 259 cartridge cases per hour. ■ This is a maximum theoretical production rate which must be reduced about 25 percent to allow for “shut" down-time” required for tool-cleaning and other adjustments, - The gears in-the head turners, as delivered to Ekco were arranged .to produce at the aforesaid rate,, i.e., the spindle or main drive gears were in the.ratio "of-55 teeth on the drive gears to 77 teeth on the driven„gear and the feed gears -were in.the ratio.of 61 to.71. In early November Ekco attempted to increase its head turner production-by. reversing the -feed gears on the machines .so as ;to permit a maximum production rate of about 332 cases per hour. .However, the machines -then worked worse than before, and Ekco again called: in Mr. Haas on November 10, 1955. After consulting-with .his supervisor at The New Britain -Machine Company, Mr. Haas recommended, to Ekco personnel that .they return the.machines to the original gear ratios for a maximum production rate of :259 cases per hour, and this was done. • . ■ - ■. .
19. Despite the assistance rendered.by Mr. Haas, Ekco continued • to • experience operating difficulties with' 3. of the head turners, and also was dissatisfied with their low rate of production. Therefore, in early December 1955, Ekco again sent its representative to the' Clayton-Lambert Company with instructions to study specifically that company’s operating techniques on New Britain 656 head turners.[15] Ekco’s representative learned that Clayton-Lambert, contrary to the recommendations of the New Britain Machine Company,- had speeded up the maximum production rate on its head turners from 259 cases per hour to 420 cases per hour. It accomplished this increased rate by changing the gear ratio on both feed and spindle gears, and as a result Clayton- *103 Lambert found that its 656 head turners ran more efficiently, permitted the use of better cutting tools, held required tolerances more- satisfactorily, and in general produced a better product. Upon receiving its representative’s report, Ekco decided to ignore the previous recommendations of Mr. Haas and, in January, ordered one set of the faster gears which it installed in one of its head turners as an experiment. Satisfied with the result, about 2 or 3 weeks later, Ekco ordered the necessary feed and spindle gears and speeded up all its machines. Thereafter, the head turners worked better ■than before, and production at the head turners increased considerably,. although Ekco continued to experience some trouble maintáing required tolerances, especially with head turner No. 4.
20. The difficulties encountered by Ekco in repairing and rehabilitating the 4 head turners may be summarized as follows:
(a) Head turner No. 1 had to be taken apart to find the cause of excessive oil leakage. Chucking pressure could not be maintained so as to meet required tolerances.[16] Cylinders and pistons were badly scored, so that the cylinders had to be rebored and new pistons installed. Five bearings were replaced. The distributor and housing were scored and had to be rebuilt. Six distributor heads were purchased for the spindles due to excessive wear causing leakage.
(b) Head turner No. 2 was the best of the 4 machines. However, its cross slides were frozen on the pins so that they had to be pressed out, honed and lapped back in, which, according to Mr. Haas, was “a pretty fair job” of repair.
(e) Head turner No. 3 required replacement of three bearings on the primary shaft and two on the spindle drive shaft. The spindle carrier was loose and needed readjustment. The tool cross slide also had a tight bushing, causing chip *104 ping of the tool. The spindle clutch would not engage, and upon disassembly, the clutch assembly was found to be cracked, requiring replacement thereof. Bearings were replaced in the No. 5 spindle to eliminate chatter.
(d) Head turner No. 4 was in the poorest Condition of all the machines. Complete disassembly of this machine was required. Bearings were rusty with flat spots and had to be replaced. After Mr. Haas had disassembled the machine and put it together again, there was still some end play which prevented the machine from operating within required tolerances. The spindle carrier was found to be moving on the carrier’s stem, and this defect required a complete overhaul of carrier and stem. Piston bodies and pistons had to be reworked and rings installed in the pistons. The main distributor and distributor shaft had to be reworked and distributor pipes replaced. The friction clutch units had to be reworked and in part replaced.
All 4 machines required modernization through installation of new chucks, or collets, new hydraulic pumps, and new electric motors. The total repairs done to head turners 1, 3, and 4 are properly characterized as major repairs. Comparatively speaking, the repairs done to head turner 2 were minor.
21. The foregoing operational difficulties caused a “bottleneck” in Ekco’s 40 mm. production line, through a piling-up of unmachined cartridge cases at the head turners while they were undergoing repairs. By February 1956 when 3 of the head turners were operating i'easonably well, this production bottleneck had been corrected, and only minor difficulties in holding required tolerances were experienced thereafter. The following production table shows the progress made:

*105

*106 The problems of the No. 4 head turner were never adequately solved, and it was only operated on 39 days out of the entire production period.
Clearly, at the time of receipt of the 4 head turners from the Navy, only machine No. 2 could fairly be described as “in good condition with considerable use left before any important repairs would be required,” as contemplated by the condition code symbol 0-2. The other 3 machines required important repairs.
The evidence shows that Ekco expended at least $8,130.28 for installation, repair, and rehabilitation of all the head turners. Under Amendment No. 8 to Contract NOrd (F) 1486, Ekco was entitled to reimbursement of its rehabilitation costs for all Part V-B facilities in an estimated amount of $10,250. (See finding No. 8) Accordingly, Ekco claimed reimbursement from the Navy in said amount of $8,130.28, plus $1,421.52 for “burden”, or a total of $9,551.80. Following audit of the claim, the Navy paid Ekco the full amount thereof. Ekco made no specific reimbursement request for repairs to the head turners in any other amount.[17] The last purchase by Ekco of repair parts for the head turners was made on Fébruary 17, 1956, and Ekco’s records show that it expended $259.49 in labor costs for head turner rehabilitation in 1956. At the completion of the contract, and after Ekco had repaired and rehabilitated the head turners as described in finding 20, supra, they were returned to the Navy, and, at that time, by reason of Ekco’s repair work, at- leasfr'three of them were in goodroperating condition. Ekco’s ultimate success in repairing and rehabilitating the head turners is also indicated by the fact that the ratio of cartridge cases rejected on final inspection by reason of head turning defects dropped from 21.6 percent of total production in 1955 to 7.6 percent of total production during the last 3 months of the production period.
*107 22. Defendant denies that the defective head turners were the real cause of Ekco’s production difficulties and asserts instead that those difficulties flowed from a combination of Ekco’s inexperience in the manufacture of 40 mm. cartridge cases, the use of a “makeshift” heat treating system prior to completion of the Ajax furnace in January 1956, failure to receive an early delivery of required equipment and special tooling from suppliers, delays in rehabilitation of equipment and rearrangement of the assembly line, lack-of manpower for a second shift, and a delay by Ekco until January 1956 in increasing the spindle speeds on the head turners. To support these assertions, defendant has submitted a series of mathematical computations, using figures from Ekco’s daily production records, which, in defendant’s view, lead to the conclusion that head turner production was actually ahead of all other operations in the assembly line, and was probably slowed down because of them. In view of the record herein, however, such mathematical analysis is not considered probative.[13] It fails to reflect a. large amount of uncontradicted oral testimony by Ekco’s management and assembly line personnel that in the early months of production, they personally observed frequent breakdowns of the head turners with a consequent “pileup” of cartridge cases at that point in the production line. The Navy’s Supervisor of Inspection, who was stationed at Ekco’s plant, testified that the trouble EkcO was experiencing with the head turners was “common knowledge.” It is therefore reasonable to conclude that the head turners were the true bottleneck in Ekco’s production line. If the 4 machines when received by Ekco had been in sufficiently good condition that, without any important repairs, they could have produced satisfactory cartridge cases at even New Britain’s recommended capacity rate of 259 cases per hour, the record justifies the conclusion that Ekco would have been able to produce at the head turners a sufficient number of cartridge cases to have met the contract delivery schedule.
*108 DAMAGES
23. Ekco received from defendant under contract NOrd 15,579, the sum of $1,465,020.68. Ekco has asserted that its costs allocable to the contract amounted to $1,627,474.90, whereas defendant, after audit of Ekco’s books has computed costs applicable to the contract’ at $1,566,987.24, the differences between the parties being reflected by the following schedule:

24. From the evidence in this record, the proper resolution of the aforesaid differences is as follows:
(a) As to direct material costs, the parties are in dispute as to the proper treatment of the cost to Ekco of certain unused supplies on hand at completion of the contract, including 18,000 steel discs of the type used in the manufacture of 40 mm cartridge cases. The total amount involved is $6,554. Defendant has eliminated in its computations the entire cost of the remaining inventory, whereas Ekco has included the entire' cost thereof in its direct material costs. The proper treatment of such remaining inventory is to allow the cost thereof less its scrap value. So far as the record discloses, Ekco has never disposed of these remaining supplies, and no evidence was presented as to the scrap value thereof. Absent such evidence, it is deemed reasonable to assign scrap value of 25 percent of cost for this disputed item. Accordingly, Ekco is entitled to treat as a part of its direct material costs the sum of $4,915.50 covering unused supplies (cost less scrap value) on hand at completion of the contract. When this sum is added to undisputed items, total direct material costs applicable to this contract are found to be $470,765.12.
*109 (b) The' parties further disagree as to the amount of manufacturing overhead allocable to this contract. The amount of overhead in dispute totals $29,715, consisting of $21,308' in charges to the “Kepairs to Machinery and Equipment” account and $8,407 out of 1955 Ordnance Laboratory costs claimed by defendant to have no proven relationship to production under the present contract. Ekco has not discharged its burden of proving that the items so disputed by defendant should properly be allocated to manufacturing overhead costs under this contract. There is no satisfactory proof that the charges to the machinery and equipment repair account are normal production costs related to Contract NOrd 15,579, nor is there proof as to the type and ownership of equipment to which repairs were made. With respect to the Ordnance Laboratory costs claimed by Ekco for periods prior to production, no proper showing was made as to their connection with Contract NOrd 15,579. Therefore, the proven cost of manufacturing overhead applicable to this contract is found to be the amount verified by defendant’s audit, namely $783,678.86.
(c) Ekco has also claimed $10,131.54 as its best estimate of shipping expense which should fairly be applicable to this contract. This estimate is not subject to verification in the books and records of Ekco, nor can it be determined with required certainty whether or not such estimated shipping expense might already be reflected, in whole or in part, in direct costs previously found applicable to the contract. Therefore, such item of estimated cost must be eliminated as speculative.
25. Summarizing the foregoing findings, the admitted or proven costs incurred by Ekco in the performance of Contract NOrd 15,579 are as follows:
Direct Material Costs_ $470, 765.12
Material Handling Costs_ 18, 747.00
Manufacturing Overhead_!_ 783,678. 86
Direct Labor Costs_ 239, 606.17
Total Factory Costs_$1,512,797.16
General and Administrative Expense (4.74 percent of factory costs)_ 71,- 706. 58
Total Costs_$1,584,503.73
*110 26. Since Ekco received $1,465,020.68 under the contract, and its costs of performance, as summarized in the preceding finding, amounted to $1,584,503.78, Ekco sustained a direct loss of $119,483.05. Since, however, Ekco made an undisputed profit under the special tooling provision of the contract amounting to $12,368, its overall loss under the contract as a whole amounted to $107,115.05. Defendant’s representatives had knowledge of, and did not object to, Ekco’s original estimate of profit on this contract at the rate of 10 percent, or .13147 per unit, for a total of $131,467. This was a reasonable profit expectation under such a contract as NOrd 15,579. When said profit is added to Ekco’s overall loss of $107,115.05, the total of damages and reasonably estimated profit established by Ekco amounts to $238,582.05.
27. In its presentation of rebuttal evidence, Ekco for the first time presented an alternate theory of damages suffered by it in the performance of NOrd 15,579. This alternate theory- was .based upon the difference -between what Ekco estimated it would have cost to complete the contract without assumed delays of 2 months in the pre-production period and 4 months in the production period as contrasted with the actual costs incurred in completing the contract. This alternate theory increased Ekco’s claim to $393,418. Although Rule 28 (b) pretrial audit procedures were conducted in this case, Ekco’s alternate theory of damages was. presented at a much later date when defendant had no opportunity to examine Ekco’s records as to the assumed delay-periods, or to develop any evidence to the contrary. While.previous findings show that Ekco was delayed in its performance by defective and incomplete Government-furnished equipment, there is no probative evidence establishing satisfactorily what amounts of delay were properly attributable to each equipment item complained of by Ekco.
RENEGOTIATION
28. Ekco’s overall profits from Government business of $1,051,915 for the calendar year 1955 were renegotiated by The Renegotiation Board. Included in the profit and loss data submitted-by Ekco for the-Board’s consideration was a loss of $307,416 during 1955 on Contract NOrd 15,579. It *111 was determined by agreement between Ekco and the Board that during 1955 Ekco had realized excessive profits to be returned to the Government amounting to $100,000. Mr. Did-riksen represented Ekco in the negotiation of the aforesaid agreement. He informed Board representatives of the pend-ency of the present suit and asked that consideration be given to the effect of renegotiation on any possible recovery by Ekco in this litigation. Mr. Didriksen was advised that any recovery which Ekco might receive in this case would not be subject to renegotiation. This was confirmed by the Board in a letter to Ekco dated March 6, 1958, stating in pertinent part:
Our General Counsel has ruled that any amount received by you as a result of your pending action in the Court of Claims (Ekco Products Company v. United States of America, No. 46U57) arising out of contract NOrd 15,579 is not subject to renegotiation.
Without -this assurance that any recovery obtained in this lawsuit was not subject to renegotiation, Ekco would not have been willing to enter into the aforesaid renegotiation agreement.
29. Ekco is the owner of this claim, and no assignment or transfer of the claim or any part thereof or interest therein has been made.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to. recover, and it is.therefore adjudged and ordered that plaintiff recover of and from the United States the sum of two hundred thirty-eight thousand five-hundred eighty-two dollars and .five cents ($238,582.05).

 Aircraft Sales & Service v. Gantt, 52 So. 2d 388 (Ala. 1951) ; In re People, by Phillips, 250 N.Y. 410, 165 N.E. 829 (1929).

 Railroad Waterproofing Corp. v. United States, 133 Ct. Cl. 911, 137 F. Supp. 713 (1956).

 United States v. Atlantic Dredging Co. 253 U.S. 1 (1919).

 Defendant’s brief, p. 40; Volentine and Littleton v. United States, 144 Ct. Cl. 723, 169 F. Supp. 263 (1959).

 As used herein the term “cartridge case” refers to that portion of an artillery shell which is constructed to hold the explosive charge and firing device. The projectile itself is fitted into the open end of the case.

 By applicable procurement regulations, Government-furnished equipment under the circumstances Involved herein should be provided only under a facilities contract separate from any related contract for supplies or services. 32 C.F.R. Sec. 13.402. See findings 7 and 8, infra.

 As of September 11, 1957, the parties executed Amendment No. 4 to Contract NOrd 15,579 -whereby it was agreed that the price of $116,800 should be fixed at $98,412.78.

 By Amendment No. 3 to the contract, the parties agreed that the unit price as redetermined would be unchanged, namely, $1.446.

 Mr. Nelson of the Burean of Ordnance testified'at the trial that, in his opinion, the temper • furnace, mouth anneal furnace, wash tank, and flame dryer were not parts of an Ajax Electric Heat Treating Furnace which by Amendment 8 the Navy had agreed to furnish Ekco. Ekco’s expert testimony was to the contrary. Mr. Nelson was closely connected with all equipment acquisition under the contract (see finding 3, supra) and was no doubt aware of Ekeo’s request of February 10, 1955, for, $75,000 of additional furnace equipment. • Had. he been of opinion at that time that this'’ sizable request exceeded‘the-Navy’s prior cqmmitments, .it is logical to conclude that he would have entered objection thereto. So far as this record 'discloses, he did not do so, and it is significant that the Navy by Amendment No. 9 promptly agreed to Ekco’s request in its entirety.

 Ekco’s research metallurgist agreed that this might seem “like a long time,” but considering the novelty to Ekco of this furnace, he thought the time was “well spent.” .

 The Navy’s code symbol for its property needing repairs is “R”.

 In addition to the master property cards kept in Washington, a duplicate property card was attached to and physically accompanied the machine.

 The 3 head turners from Detroit sustained minor damage in shipment. Both Ekco and the Navy were aware of this, and the fact is not in issue herein.

 Ekco’s representatives were under the impression that Ekco had already received the best 656 head turners available in Government reserve. The record does not disclose whether the reserve contained any better head turners than those furnished to Ekco.

 Prior to the award of this contract and at the suggestion of the Bureau of Ordnance, Ekco had sent technical representatives to the Clayton-Lambert plant for a study of that company’s production line. At that time Clayton-Lambert was the only manufacturer producing 40 mm. cartridge' eases for the Navy, and it was an experienced operator in the overall heat treatment method of producing steel cartridge cases.

 In order to produce cartridge eases meeting the Navy’s specifications, it was necessary to hold the various operations on the head turners within very narrow tolerances, such as two to eight-thousandths of an inch. If there is excessive oil leakage, there will be insufficient hydraulic pressure, and the chuck, or collect, will not grip the cartridge case tightly or evenly as it is rotated against the cutting tool. Resultant vibration makes it impossible to obtain required tolerances, and the machine will have to be shut down for repair.

 It may fairly be inferred from the record that in accomplishing the head turner repairs described in finding 20, supra, Ekco actually expended more than the $9,551.80 for which it was reimbursed. Its machinery repairs and maintenance-accounts show total costs for the production period under-Contract NOrd 15,579 of $50,781, and the major repair difficulties were'with 'the-hedd turners. However, Ekco did not establish any specific allocation to head turner repairs out of said total costs.

 Using much of the same basic data, but starting from different premises, Ekco has submitted similar type mathematical computations leading to opposite conclusions.